ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

CHRIS JAZAIRI,                              )
                                            )
            Plaintiff,                      )
                                            )
vs.                                         )        Civil Action File
                                            )        No. CV-404-91
ROYAL OAKS APARTMENT                        )
ASSOCIATES, L.P., its Parent Company        )
And Subsidiaries, And MITCHELL L.           )
MORGAN MANAGEMENT, INC.,                    )
                                            )
            Defendants.                     )
_____)

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE SPECIFIC CAUSATION TESTIMONY FROM DR. ECKARDT JOHANNING

In her April 30, 2004 Complaint, the Plaintiff Chris Jazairi ("Ms. Jazairi") alleges that

she "has suffered serious and permanent injury to her health" and "incurred personal property

damages and money losses, past and future medical expenses and severe personal injury" as a

result of her "exposure to toxic molds." (Complaint at ¶¶ 17, 18, 27). Ms. Jazairi contends that

such exposure occurred when she leased an apartment from May 2002 to September 2002 at the

Royal Oaks Apartments in Savannah, which are owned and managed by the Defendants.

Specifically, Ms. Jazairi contends that she suffers from the following litany of problems due to

her alleged mold exposure: "Interstitial lung disease. Various other system and organ damage

and problems . . . compromised immune system . . . neurological damage, the GI tract problems.

. . . [n]ausea, diarrhea, numerous times a day. Floaters in my eyes, dizziness, memory loss,

numbness, tingling, chest pains, joint pain. Various other things that just appear. . . . Flu-like

sy[mpto]ms. . . . Fever, chills, weakness, chronic fatigue. And general aches and pains.

Difficulty breathing.   High blood pressure.   ...   Irregular menstrual cycle."   (10/13/04
Deposition of Chris Jazairi (hereafter "Jazairi Dep.") at pp. 28-29, Apx. A).[1]

On July 8, 2004, the Court issued a Scheduling Order establishing discovery and motions
deadlines, including deadlines for the parties to furnish expert witness reports pursuant to Rule
26(a)(2).   The discovery and other deadlines were extended by the Court on two occasions
pursuant to consent motions filed by the parties, and discovery closed on January 14, 2005.
Pursuant to the Court's Scheduling Orders, Ms. Jazairi provided the Defendants with expert
reports for Mr. Doug Haney and Mr. Kenneth Warren.  Mr. Warren is an industrial hygienist
offering opinions regarding the adequacy of Defendants' remediation efforts at Ms. Jazairi's
apartment. Mr. Haney is an "environmental researcher/writer," and based on Mr. Haney's report
and deposition testimony, Ms. Jazairi apparently intends to offer "expert" testimony from Mr.
Haney that "toxic" mold is capable of causing adverse health effects.[2]

It is undisputed that neither Mr. Warren nor Mr. Haney is a medical doctor and that they
do not (and cannot) offer any opinion that Ms. Jazairi's alleged health conditions were caused by
exposure to mold.  (11/02/04 Deposition of Kenneth Warren at pp. 127-128, Apx. B; 11/19/04
Deposition of Doug Haney at pp. 114, 125, 160-161, Apx. C).   As explained in Defendants'
Motion for Summary Judgment, filed simultaneously herewith, Ms. Jazairi's claims fail as a
matter of law without expert testimony that her alleged injuries were caused by exposure to mold
in her apartment. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1322 (11th Cir. 1999); Jack v.
Glaxo Wellcome Inc., 239 F. Supp. 2d 1308, 1321 (N.D. Ga. 2002).

---

[1] Throughout this brief, citations to Apx. "_" are to the exhibits in the "Appendix to Defendants'
Motions to Exclude Expert Testimony and Motion for Summary Judgment."

[2] For the reasons stated in Defendants' Motion to Exclude Expert Testimony from Doug Haney,
filed contemporaneously herewith, Defendants submit that Mr. Haney's "general causation"
testimony should be excluded under Fed. R. Evid. 702.

In an attempt to satisfy the specific causation element necessary for her claims, Ms. Jazairi apparently intends to rely on testimony from Dr. Eckardt Johanning. However, any testimony from Dr. Eckardt Johanning regarding specific causation should be excluded because (1) Ms. Jazairi has failed to comply with the expert disclosure requirements of Rule 26(a)(2) and this Court's Scheduling Order for Dr. Johanning, and (2) Dr. Johanning's opinions are not reliable and scientifically valid under standards established by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786 (1993).

**A.     Dr. Johanning's Opinions Regarding Ms. Jazairi's Alleged Health Condition.**

Although Ms. Jazairi contends that mold exposure has caused a litany of health conditions including lung disease, compromised immune system, neurological damage, and "various other system and organ damage and problems," (Jazairi Dep. at p. 28-29, Apx. A), Dr. Johanning does not and cannot provide any expert testimony supporting that litany of alleged conditions. Rather, Dr. Johanning's causation testimony is limited to opining that Ms. Jazairi "had an inflammatory lung condition that is now resolved" or "resolving" and which was caused by exposure to mold in her apartment. (12/2/04 Deposition of Eckardt Johanning (hereafter "Johanning Dep.") at pp. 115, 119, 128, 130, Apx. D). Dr. Johanning testified:

> A.    . . . [t]he follow-up CT [scan] from 11/18 showed no interstitial lung disease or other lung parenchymal abnormalities compared to the previous abnormalities.
>
> Q.    It showed a normal exam, right?
>
> A.    A normal exam, that's right. So the abnormal findings that she had in 2003 had resolved at this point apparently based on this imaging test.
>
> Q.    And then there were also pulmonary function testing conducted, right?
>
> A.    That's right.
>
> Q.    What did they tell you?

3

A.      They were conducted by me on October 13, 2004 and they essentially showed normal lung capacity, spirometry values so some of the abnormalities that she had before cleared. . . .

Q.      Now, in the present situation, you have objective tests that show you that her lung inflammation has resolved, right?

A.      Yes.

(Johanning Dep. at pp. 95-96, 130, Apx. D; 11/8/04 CT Scan Results, Apx. W). Dr. Johanning testified that any remaining "residual symptomatology" complained of by Ms. Jazairi could be caused by a "psychiatric condition." (Johanning Dep. at pp. 116-117, 130, Apx. D).

## B.    Any Expert Causation Testimony from Dr. Johanning Should Be Excluded Due To Plaintiff's Failure to Comply with Rule 26.

As stated in the Status Report jointly filed by the parties in this matter on November 1, 2004, "[u]nder the Court's September 20, 2004 Scheduling Order, the deadline for Plaintiff to furnish expert reports was October 14, 2004, and Plaintiff has designated Kenneth Warren and Doug Haney as Plaintiff's expert witnesses." (11/1/04 Joint Status Report at pp. 3-4). However, as explained above, neither Mr. Warren nor Mr. Haney is a medical doctor capable of providing expert testimony regarding the specific causation of Ms. Jazairi's alleged injuries. Ms. Jazairi apparently intends to rely on testimony from Dr. Eckardt Johanning in an attempt to establish that her alleged injuries were caused by exposure to mold in her Royal Oaks apartment. However, Ms. Jazairi has failed to comply with Rule 26(a)(2) and this Court's Scheduling Orders because Ms. Jazairi has not provided Defendants with an expert report for Dr. Johanning.

Ms. Jazairi is likely to argue that Dr. Johanning is exempt from the reporting requirements of Rule 26(a)(2) because he purportedly is a treating physician. However, any such argument fails because Ms. Jazairi's attorney has paid Dr. Johanning his "standard retainer fee" of $3,000 for a consultation with counsel and for his review of the records of Ms. Jazairi's *actual* treating physicians. (Johanning Dep. at pp. 67-68, Apx. D; 11/4/04 Correspondence from

4

Eugene Brooks to Dr. Johanning, Apx. E). Therefore, Dr. Johanning is a "witness who is retained or specially employed to provide expert testimony in the case" under Rule 26(a)(2)(B).

Moreover, any expert causation testimony from Dr. Johanning would not satisfy the standard for treating physician testimony because such causation testimony (1) would *not* be based on observations during the course of treating Ms. Jazairi, and (2) *was* acquired and developed by Ms. Jazairi in anticipation of litigation. Dr. Johanning's practice is located in Albany, New York, and he has seen Ms. Jazairi on only two occasions—in March 2003 and November 2004. (Johanning Dep. at pp. 72-73, Apx. D). Dr. Johanning has *not* prescribed any treatment for Ms. Jazairi during those visits (over a year and a half apart), but rather has focused exclusively on attempting to determine the "cause" of her alleged symptoms. In such circumstances, a physician is considered a standard expert witness subject to the requirements of Rule 26(a)(2). See Zarecki v. National R.R. Passenger Corp., 914 F. Supp. 1566, 1573 (N.D. Ill. 1996) (rejecting plaintiff's argument that witness was treating physician exempt from expert disclosure requirements of Rule 26(a)(2) because physician's "testimony goes far beyond any personal observations that he might have made during the course of treating [the plaintiff]; instead, he purports to offer conclusions as to the ultimate cause of [the plaintiff's] carpal tunnel syndrome"); Roche v. Lincoln Property Co., 278 F. Supp. 2d 744, 750 (E.D. Va. 2003) (concluding that "Plaintiffs have expanded [the physician's] expertise and opinions well within the role of a testifying expert without complying with the Court's Scheduling Order or Federal Rule of Civil Procedure 26. Thus, the Court analyzes [the physician's] testimony as a testifying expert and not as a treating physician"). In addition, when Ms. Jazairi first visited in March 2003, she had been contacting attorneys for almost a year in regard to representing her in a lawsuit against the Defendants. (Jazairi Dep. at pp. 23-24, 18-19, Apx. A) (testifying that she

5

contacted attorneys regarding her "case" before her engagement to David Potter ended in April 2002)). Thus, Ms. Jazairi clearly consulted Dr. Johanning in anticipation of litigation.

Finally, in her "Motion for Extension of Time to Name Expert Witnesses and Enter a Special Case Management Order," which was filed with the Court on August 25, 2004, Ms. Jazairi expressly discussed Dr. Johanning and represented that he would be disclosed as an expert witness once he completed "additional testing" of Ms. Jazairi. (Plaintiff's 8/25/04 Motion at p. 2, ¶ 5). Despite such representations and the close of the discovery period, Ms. Jazairi has not provided an expert report for Dr. Johanning as required by Rule 26(a)(2)(B). Therefore, any causation testimony from Dr. Johanning should be excluded due to Ms. Jazairi's noncompliance with Rule 26 and this Court's Scheduling Orders. Jack v. Glaxo Wellcome Inc., 239 F. Supp. 2d 1308, 1318-19 (N.D. Ga. 2002) ("[a]rguing that [the defendant] should have known ignores the clear requirement that Rule 26 places on the party who intends to offer an expert to affirmatively notify the opposing party of that fact and to provide an expert report. . . . it is likely that the defendant was not substantially prejudiced by the plaintiff's failure to comply with the rules. Nevertheless, the court finds the plaintiff's noncompliance with Rule 26 to be sufficient grounds to exclude [the expert]'s opinion testimony").

## C.    Dr. Johanning's Testimony Should Be Excluded Under *Daubert*.

As the party seeking to admit proposed expert testimony, Ms. Jazairi "bears the burden of demonstrating that each of [her] proffered experts is qualified to render an expert opinion, that the opinion is reliable, and that the opinion would assist the trier of fact in resolving a disputed issue of material fact." McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004); McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002). The admissibility of expert testimony "must be shown by a preponderance of the evidence." Id. In the instant case, Ms. Jazairi is unable to satisfy that burden as a matter of law because, under the standards established

6

by the U.S. Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786 (1993), the testimony of Dr. Johanning is not based on scientifically valid methodology.

## 1.    The Court's Rigorous and Exacting Gatekeeping Function.

In Daubert, 509 U.S. at 589, 113 S. Ct. at 2795, the Supreme Court directed that district courts "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." The applicable Federal Rule of Evidence, Rule 702, was amended in response to Daubert and its substantial progeny, and now provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In U.S. v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc), the Eleventh Circuit explained that "the Supreme Court made abundantly clear in Daubert [that] Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert *scientific* evidence." The court in Frazier further explained that

> in determining the admissibility of expert testimony under Rule 702, we engage in a *rigorous* three-part inquiry. Trial courts must consider whether:
>
> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the experts reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. at 1260 (emphasis added). In Rider v. Sandoz Pharm. Corp., 295 F.3d 1194 (11th Cir. 2002), the Eleventh Circuit reasoned that

> [t]he *Daubert* trilogy, in shifting the focus to the kind of empirically supported, rationally explained reasoning required in science, has greatly improved the quality of the evidence upon which juries base their verdicts. Although making

> determinations of reliability may present a court with the difficult task of ruling on matters that are outside of its field of expertise, this is "less objectionable than dumping a barrage of scientific evidence on a jury, who would likely be less equipped than the judge to make reliability and relevance determinations."

Id. at 1197.  In discussing the requirements of Daubert, the Eleventh Circuit has repeatedly emphasized the importance of the district court employing an exacting analysis in evaluating the competency, reliability, and relevance of proffered expert testimony: "[t]he district court's role is especially significant since the expert's opinion 'can be both powerful and quite misleading because of the [jury's] difficulty in evaluating it.'"  Frazier, 387 F.3d at 1260 (stating that "[t]he importance of Daubert's gatekeeping requirement *cannot be overstated*") (emphasis added); e.g. McCorvey, 298 F.3d at 1257 (explaining that Daubert requires a district court "to conduct an *exacting* analysis of the proffered expert's methodology") (emphasis added).

In Daubert, the Supreme Court listed four non-inclusive factors that district courts should consider in determining reliability under Rule 702:  (1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community.  Daubert, 509 U.S. at 593-94, 113 S. Ct. at 2786; Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999).  The Daubert court recognized that such factors were a starting point for a court's analysis, and the Eleventh Circuit has identified additional relevant factors such as whether the expert improperly relies "on anecdotal evidence (as in case reports), temporal proximity, and improper extrapolation (as in animal studies)." Allison, 184 F.3d at 1312.  Under the exacting and rigorous analysis required by Daubert, the specific causation testimony of Dr. Johanning is unreliable and without scientific validity.[3]

---

[3]  In Frank v. New York, 972 F. Supp. 130, 131 (N.D.N.Y. 1997), Dr. Johanning's proposed expert testimony that the plaintiffs suffered from "multiple chemical sensitivity" caused by

## 2.    Dr. Johanning's Testimony Is Not Based On Scientifically Valid Methodology.

Dr. Johanning's testimony is inadmissible because he is unable to establish, through any acceptable methodology, that Ms. Jazairi's alleged injuries were caused by exposure to harmful levels of mold within her apartment.  Dr. Johanning's causation testimony is neither reliable nor scientifically valid because (1) the scientific and medical community has found no causal relationship between mold exposure and the "inflammatory lung condition" and other health conditions allegedly suffered by Ms. Jazairi; (2) Dr. Johanning concedes that no definable standards exist for determining whether an individual will react to various levels of mold and expressly acknowledges the significant variability in individuals' responses to mold exposures; (3) Dr. Johanning admits that he has no knowledge regarding the level of airborne mold in Ms. Jazairi's apartment, the dose of any mold spores to which Ms. Jazairi was allegedly exposed, and that there is no scientific basis for determining what level of mold spores could have caused her condition; and (4) Dr. Johanning has employed a flawed differential diagnosis in that the objective testing conducted on Ms. Jazairi showed no sensitivity or reaction to the specific molds present in her apartment and thus Dr. Johanning failed to properly "rule in" such molds as the cause of her condition, while also failing to properly "rule out" numerous other potential causes.

### a.    Dr. Johanning's Specific Causation Theory Is *Not* Generally Accepted Within the Scientific Community.

In early 2002, the U.S. Department of Health and Human Services and the Centers for Disease Control and Prevention ("CDC") sponsored a two-year study analyzing potential health effects relating to damp or moldy indoor environments.  The CDC asked the National Academy of Sciences' Institute of Medicine ("IOM") to convene a committee of leading medical, public

---

exposure to chemicals and other substances was *excluded* by the court because it failed to meet the standard of "evidentiary reliability" established in Daubert.

9

health, toxicology, and epidemiology experts to "conduct a comprehensive review of the scientific literature regarding the relationship between damp or moldy indoor environments and the manifestation of adverse health effects, particularly respiratory and allergic symptoms. The review will focus on the non-infectious health effects of fungi, including allergens, mycotoxins and other biologically active products." (Institute of Medicine, Damp Indoor Spaces and Health, 2004, at p. 2, Apx. F). In 2004, the IOM released its report entitled "Damp Indoor Spaces and Health" (hereafter "the IOM Report"). Based on its review of the relevant scientific and medical literature, the IOM concluded that there was *not* "sufficient evidence of a causal relationship" between exposure to mold or damp indoor environments and any adverse health effects. (IOM Report, at pp. 9-11, Apx. F). Specifically, the IOM found that there was "inadequate or insufficient evidence to determine whether an association exists" between exposure to mold or damp indoor environments and a variety of a health conditions, including dyspnea (shortness of breath), airflow obstruction, chronic obstructive pulmonary disease, lower respiratory illness, fatigue, gastrointestinal tract problems, and neuropsychiatric symptoms. (Id.).[4]

The recent findings in the IOM report echo earlier reports from the scientific and medical community regarding the *lack* of causal relationship between exposure to mold and adverse health effects. For example, in October 2002, the American College of Occupational and Environmental Medicine, conducted its evaluation of the science related to mold and adverse human health effects, and concluded that "[c]urrent scientific evidence does not support the

---

[4] The IOM report did find "sufficient evidence of an association," but *no* causal relationship, between mold exposure and "upper respiratory (nasal and throat) tract symptoms." (IOM Report at p. 10, Apx. F). However, that finding provides *no* support for Dr. Johanning's causation opinion regarding Ms. Jazairi's lung condition because the condition is a *lower* respiratory illness, for which the IOM found inadequate evidence of an association with mold, and because "showing *association* is far removed from proving *causation*." Allison v. McGhan Med. Corp.,

10

proposition that human health has been adversely affected by inhaled mycotoxins in the home, school or office environment." (10/27/02 Statement of the American College of Occupational and Environmental Medicine (hereafter "the ACOEM Report"), at p. 1, Apx. G). The American College of Occupational and Environmental Medicine further concluded:

> Molds growing indoors are believed by some to cause building-related symptoms. Despite a voluminous literature on the subject, the causal association remains *weak and unproven*, particularly with respect to causation by mycotoxins. One mold in particular, *Stachybotrys chartarum*, is blamed for a diverse array of maladies when it is found indoors. Despite its well-known ability to produce mycotoxins under appropriate growth conditions, years of intensive study have *failed* to establish exposure to *S. chartarum* in home, school, or office environments as a cause of adverse health effects.

(Id. at p. 6) (emphasis added); (Affidavit of Dr. Raymond Harbison at ¶ 9, pp. 5-7, Apx. H).

The findings of the IOM and the ACOEM demonstrate that Dr. Johanning's specific causation theory has *not* "attained general acceptance within the scientific community" and thus fails the fourth prong of Daubert's reliability test. Daubert, 509 U.S. at 593-94, 113 S. Ct. at 2786; see Jack v. Glaxo Wellcome Inc., 239 F. Supp. 2d 1308, 1317-18 (N.D. Ga. 2002) (emphasizing that "the complete silence on the subject from the medical community is persuasive" and excluding testimony from physicians that drug Zyban could cause panic disorder because "the plaintiff has presented no evidence that the medical community has accepted the notion that bupropion [active ingredient in Zyban] can cause panic attacks or panic disorder").

**b.  Dr. Johanning Concedes That There Are No Definable Standards for Mold Exposure and Cannot Identify Scientific Literature Supporting His Specific Causation Opinion.**

In its 2004 Report, the Institute of Medicine explained that "there are no generally accepted health-based standards for acceptable concentrations of fungal spores, hyphae, or

---

184 F.3d 1300, 1315 n.16 (11th Cir. 1999) (emphasis in original) (concluding that district court properly rejected study which solely suggested association between silicone and disease).

metabolites in the air or on surface." (IOM Report at p. 12, Apx. F). In a recent mold case that is eerily reminiscent of the instant case, the court in Roche v. Lincoln Property Co., 278 F. Supp. 2d 744 (E.D. Va. 2003), excluded a physician's specific causation testimony based, in part, on the lack of generally-accepted, definable standards for mold exposure.

In Roche, the plaintiffs claimed to suffer respiratory and other illnesses caused by exposure to "toxic" mold in their apartment, and sued the apartment owner and its management firm for allowing toxic levels of mold to develop in the apartment. Id. at 745-46. The plaintiffs proffered one expert, an allergist, to testify on the molds' causation of their illnesses. Id. at 747. After evaluating the reliability and relevance of the expert's testimony under the Daubert standard, and considering whether the expert adhered to and applied a valid scientific methodology, the Roche court rejected the expert's specific causation testimony as scientifically invalid. Id. at 746. In excluding the expert's testimony that mold in the tenants' apartment caused respiratory and other ailments, the court in Roche concluded that the expert's "reliance on articles concerning Stachybotrys and other molds and their effects on humans *is erroneous* because most of those and other articles state that there are *no standards* as to what quantity of mold is acceptable in indoor environments with respect to health and that establishing a direct link between mold exposure and health problems is difficult because individuals have *different sensitivities to molds*." Roche, 278 F. Supp. 2d at 752 (emphasis added).

Dr. Johanning has similarly acknowledged the complete lack of any definable standards regarding the acceptable level of indoor mold, as well as the variability of individual sensitivities to mold. In his December 2, 2004 deposition, Dr. Johanning testified:

Q.     Are there any definable standards for determining whether an individual will react to exposure to various levels of mold?

A.     Well, on a habitual basis, it's very difficult because there's so many factors you need to think about. It starts with the person, their past

12

> medical history and genetic makeup, so to speak, the circumstances of the exposure, the duration, the intensity, the makeup of the exposure which can vary so much. There's so many variables in it that could make a difference.
>
> Q.   So are there any definable standards?
>
> A.   No, for that reason, it's probably not the case. And it depends on the person, the population you are talking about, under what circumstances and for what purpose.

(Johanning Dep. at pp. 50-51, Apx. D).[5]  The acknowledged lack of any standards to determine

whether exposure to mold caused Ms. Jazairi's alleged health condition renders Dr. Johanning's

specific causation testimony unreliable and inadmissible. See Roche, 278 F. Supp. 2d at 752;

Graham v. Lautrec, Ltd., No. 01-031717-CE, 2003 WL 23512133, at *5-6 (Mich. Cir. Ct. July

24, 2003) (granting defendants' motion to exclude expert testimony that plaintiffs' exposure to

mold caused their adverse health effects because "[t]here is no definitive standard to determine

whether exposure to certain types of mold causes disease or illness. . . . Where the scientific

community is conflicted about its ability to establish standard[s] related to mold exposure, a

court cannot be a place for applying and deliberating on such speculative standards") (Apx. X).

Moreover, Dr. Johanning does not, and cannot, present any evidence that the scientific

and medical community has accepted the proposition that exposure to indoor mold causes

adverse health effects similar to Ms. Jazairi's "inflammatory lung condition," or any of her other

alleged ailments. When asked to identify scientific and medical literature supporting his opinion

that Ms. Jazairi's alleged condition was caused by exposure to mold, Dr. Johanning claimed

"there's quite a bit," but did not specifically identify any such literature and candidly

---

[5] Ms. Jazairi's designated expert Doug Haney similarly testified that "neither we nor the medical profession can accurately predict that you and your family members, if exposed to long-term high levels of exposures to dangerous 'toxic molds,' have strong enough genetic and immune protection systems to keep you safe from moldy 'secondary chemicals' (mycotoxins) when disturbed." (Haney Dep. at p. 144, Apx. C).

acknowledged that "[c]learly, it's a rare condition. I don't think most people will respond in these circumstances the way she did and maybe there was something else there that we didn't identify that made her respond this way." (Johanning Dep. at p. 127, Apx. D).

Dr. Johanning's inability to identify supporting scientific literature (as well as the directly contrary findings of the IOM and the ACOEM) renders his specific causation testimony unreliable and inadmissible under Daubert. See McDowell v. Brown, 392 F.3d 1283, 1300 (11th Cir. 2004) (affirming exclusion of expert testimony because expert "could not identify any empirical data, survey, study, or literature to support his theory"); Allison, 184 F.3d at 1315 ("Joiner made it clear that although principles and methodology were the focus, the court was not precluded from looking at conclusions") (citing General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512 (1997)).

### c.    Dr. Johanning's Causation Opinion Is Not Based On A Reliable Methodology.

Dr. Johanning's causation testimony cannot be based on any scientifically acceptable methodology, or the application of an accepted methodology, because he admittedly had *no* knowledge regarding the level of airborne mold in Ms. Jazairi's apartment or the dose of any mold spores to which she was allegedly exposed. Thus, even assuming that Dr. Johanning's diagnosis of Ms. Jazairi's lung condition is correct, Dr. Johanning's opinion that Ms. Jazairi's alleged mold exposure proximately caused her condition is scientifically invalid and therefore inadmissible. See Rider v. Sandoz Pharm. Corp., 295 F.3d 1194, 1196 (11th Cir. 2002) (explaining that district court "drew a careful distinction between clinical process, in which conclusions must be extrapolated from incomplete data, and the scientific method, in which conclusions must be drawn from an accepted process" and thus properly excluded testimony from plaintiffs' experts because "they were relying on the former").

14

As explained by the court in Roche, in order to form an opinion that exposure to a particular toxic substance proximately caused a specific illness or condition, an expert must apply the principles and methods of toxicology.   Roche, 278 F. Supp. 2d at 754.   That methodology has been "endorsed by the World Health Organization, the National Academy of Sciences, and various agencies of the United States Government," and the methodology requires:

> First, an evaluation is made of the molds to which the individual might have been exposed, and of *the concentrations* of these molds in air breathed by the individual.   The second step involves an evaluation, based on the published scientific literature, of *the exposures necessary to produce the adverse effects* associated with the molds to which the individuals may be exposed.   These two evaluations are then combined in the final step of the risk assessment to provide an estimate of the likelihood that any of the harmful properties of any or all of the molds might have been expressed in the exposed individual.

Id. (emphasis added) (quoting Cavallo v. Star Enter., 892 F. Supp. 756, 764 (E.D. Va. 1995)).  A similar methodology is described by Dr. Raymond Harbison as the "minimal" methodology required by the scientific community before any reasonable medical or scientific probability can be expressed relating a purported toxic exposure to an observed effect in a specific individual. (Harbison Aff. at ¶ 16, Apx. H).

It is clear from Dr. Johanning's testimony that he failed to employ the proper methodology at its first step because he had *no* knowledge of and did not consider the actual concentration and duration of Ms. Jazairi's alleged mold exposure. Dr. Johanning acknowledged that there are no results from any air sampling for molds in her apartment. (Johanning Dep. at p. 114, Apx. D). Rather, Dr. Johanning assumes that Ms. Jazairi was exposed to, and breathed in, airborne mold spores because the presence of mold was detected on building materials in the apartment. (Id. at p. 114). However, Dr. Johanning admitted that the presence of mold on building materials does "not necessarily" mean that there was respirable mold in the air in Ms.

Jazairi's apartment and that he has no knowledge regarding the dose of any mold spores to which

she was exposed. (Id. at pp. 114, 149). Dr. Johanning testified:

> Q.     And you have no data as to how much mold, how many mold spores, what
>         concentration left the surface where it was found and got into the air while
>         she was in the house, correct?
>
> A.     I don't have that data, no.
>
> Q.     And you do not know what dose she inhaled, how, what concentration of
>         mold spores, how many mold spores, how long a period of time, correct?
>
>        . . .
>
> A.     I told you she got enough to get sick. That's what I believe. I cannot
>        quantify it on the hour to hour day to day basis, no.

(Johanning Dep. at pp. 152-53, Apx. D). When questioned further regarding his assumption that

Ms. Jazairi inhaled mold spores in her apartment, Dr. Johanning testified:

> Q.     And you're saying the mold spores from the mold that was found by the
>         Air Quality Sciences report?
>
> A.     Including that. I think there's more there. I don't think this is sufficient
>        evidence, not evidence, testing to characterize the air exposure, per se,
>        because it's very limited testing, I mean.
>
> Q.     Well, you don't have any –
>
> A.     This wasn't a research project. Okay. I described to you the available
>        information. I'm giving you, based on my training and experience, the
>        best answer and explanation to what I think is going on here.

(Johanning Dep. at p. 143, Apx. D).[6]

Dr. Johanning's attempted reliance on his "experience" to compensate for his lack of data

on the level of airborne mold in Ms. Jazairi's apartment and the dose of any mold spores to

---

[6] Dr. Johanning's assumption that Ms. Jazairi inhaled mold spores is contrary to the consensus of
the medical community. (ACOEM Report at p. 6, Apx. G) ("The presence of toxigenic molds
within a home, school, or office environment should not by itself be regarded as demonstrating
that mcyotoxins were present or that occupants of that environment absorbed a toxic dose of
mycotoxins").

which she was allegedly exposed is not a valid scientific methodology sufficient for admissibility under Daubert. As explained by the Eleventh Circuit: "[i]f admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." U.S. v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc); see Roche, 278 F. Supp. 2d at 754-55 ("[physician's] reliance on his anecdotal experience to form a conclusion as to specific causation is unfounded because his anecdotal experience is not based on the methods of science"); Fed. R. Evid. 702 advisory committee's note (2000) ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts").

In addition, not only does Dr. Johanning lack any knowledge regarding the dose of Ms. Jazairi's alleged mold exposure, he acknowledges that there is *no* scientific basis for determining what level or concentration of mold spores could have caused Ms. Jazairi's alleged condition:

Q.     What level of or concentration of spores in the air, in your opinion, can cause the kind of problems that you believe Ms. Jazairi suffered?

A.     Well, that's hard to tell. I don't think anyone ever did a study on this.

(Johanning Dep. at p. 145, Apx. D); (Harbison Aff. at ¶¶ 7, 12, 15, 17, Apx. H). Therefore, Dr. Johanning's opinion fails the second step of the accepted toxicological methodology for specific causation testimony—that the expert conduct "an evaluation, based on the published scientific literature, of *the exposures necessary to produce the adverse effects* associated with the molds to which the individuals may be exposed." Roche, 278 F. Supp. 2d at 754.

Finally, Dr. Johanning also admitted that he had no knowledge regarding the *type* of *Stachybotrys* mold present in Ms. Jazairi's apartment because no chemical analysis was

17

performed on the mold sample, and thus Dr. Johanning could not form an opinion regarding whether such *Stachybotrys* produced mycotoxins:

> Q.    What type of stachybotrys is involved in Ms. Jazairi's case?
>
> A.    I can't tell you specifically what particular genus type or the way it's classified . . .
>
> Q.    Why is that?
>
> A.    Because they didn't do a chemical analysis on that. . . .
>
> Q.    Is it true that without knowing what kind of stachybotrys was present, can you say whether or not the stachybotrys in Ms. Jazairi's apartment produced m[yco]toxins?
>
> A.    No, I can't with certainty.

(Johanning Dep. at pp. 41-43, Apx. D); (ACOEM Report at p. 4, Apx. G). Dr. Johanning testified that, in a mold case in California, the court *excluded* any testimony from him regarding the alleged toxicity of mold because such chemical analysis and "toxicity testing" was not conducted. (Id. at pp. 16-20).

In light of (1) the lack of any data regarding the level and type of airborne mold in Ms. Jazairi's apartment, (2) Dr. Johanning's lack of knowledge regarding the dose of any mold spores to which Ms. Jazairi was allegedly exposed, and (3) Dr. Johanning's admission that there is no scientific basis for determining what level of mold spores could have caused Ms. Jazairi's alleged condition, Dr. Johanning clearly lacks a scientifically valid and reliable methodology to support his specific causation testimony. (Harbison Aff. at ¶¶ 7, 12, 15, 17, Apx. H); see Roche, 278 F. Supp. 2d at 752 (physician "admitted to lacking any knowledge of the levels required for these various molds to become toxic or of the levels required for the molds to affect the [plaintiffs]. Thus, he is unable to establish a direct nexus between the levels of exposure to the mold and any subsequent illnesses that overcame the [plaintiffs]"); Wills v. Amerada Hess Corp.,

379 F.3d 32, 48-49 (2nd Cir. 2004) (concluding that court properly rejected causation testimony from plaintiff's expert because expert was unaware of dose of hazardous chemicals to which plaintiff was exposed and thus expert failed to consider the "dose-response relationship [which] was the more generally accepted theory of causation in scientific community").

### d.    Dr. Johanning's Flawed Differential Diagnosis.

Dr. Johanning apparently ascribed to a "differential diagnosis" approach in forming his opinions regarding the specific cause of Ms. Jazairi's health condition. (Johanning Dep. at p. 52, Apx. D). The methodology of differential diagnosis "is a patient-specific process of elimination that medical practitioners use in an attempt to identify the 'most likely' cause of a set of signs and symptoms from a list of possible causes." Siharath v. Sandoz Pharm. Corp., 131 F. Supp. 2d 1347, 1362 (N.D. Ga. 2001), aff'd Rider v. Sandoz Pharm. Corp., 295 F.3d 1194 (11th Cir. 2002). However, differential diagnosis, "does not by itself unequivocally prove the cause, even for the particular patient. Nor can the process establish general causation. ... Indeed, differential diagnosis assumes that general causation has been proven for the entire list of possible causes that are eliminated one-by-one." Id.

As explained by the court in Roche, a valid differential diagnosis requires that the physician "have *ruled in* the various molds that the [plaintiffs] were exposed to at their apartment, and he should have *ruled out* all other potential causes to determine that the [plaintiffs'] injuries were proximately caused by these molds." Roche, 278 F. Supp. 2d at 750-51 (emphasis added). "'A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion.'" Id. at 751 (quoting Westberry v. Gislaved gummi AB, 178 F.3d 257, 262 (4th Cir. 1999)).

Even if Ms. Jazairi had reliable expert testimony establishing that mold *is capable* of causing her condition (*i.e.*, general causation), Dr. Johanning's differential diagnosis approach in attempting to establish that exposure to mold in fact caused her condition (*i.e.*, specific causation) is flawed because Dr. Johanning failed to properly "rule in" the specific molds present in Ms. Jazairi's apartment as the cause of her condition and also failed to properly "rule out" numerous other potential causes, such as Ms. Jazairi's over twenty-year history of smoking and any allergy to dog hair, pollen, grass, trees, outdoor mold species, and other common allergens.

The "allergy-type" testing conducted by Dr. Johanning on Ms. Jazairi regarding her sensitivity or reaction to *Stachybotrys*, *Alternaria*, *Aspergillus*, *Aureobasidium*, *Cladosporium*, and other molds purportedly present in her apartment indicated, in both August and November 2004, that Ms. Jazairi had *no* sensitivity or allergic reaction to such molds.

Q.     [Did you] test her sensitivity to other molds other than stachybotrys?

A.     Yes.

Q.     What other ones?

A.     We looked at IgE and aspergillus chaetomium, aspergillus fumigatus specifically, chaetomium, cladosporium, penicillium. We looked at alternaria, aureobasidium, penicillium notatum, trichoderma, then phoma herbarum and, well, lastly, thermoactinomyces which she reacted which isn't, per se, a mold. It's more in the bacteria group.

Q.     What was her, the result of the testing to all the molds you mentioned?

A.     The other tests were essentially normal.

Q:     No reaction?

A.     No reaction.

(Johanning Dep. at pp. 109-110, 88, 90, Apx. D; 8/5/04 Laboratory Reports, Apx. J; 11/23/04 Laboratory Reports, Apx. K). Such testing only indicated Ms. Jazairi's sensitivity to a bacteria, *Thermoactinomyces*, which was not detected in her apartment. (Id.)

The fact that testing showed (on two separate occasions) that Ms. Jazairi was *not* allergic to the particular types of mold present in her apartment completely undercuts Dr. Johanning's attempt to rule in such mold types as the specific cause of Ms. Jazairi's condition. (Harbison Aff. at ¶ 10, Apx. H). In Roche, the court expressly cited such negative allergy testing as a key factor in excluding the physician's specific causation testimony: "[the physician's] differential diagnosis, however, is scientifically invalid and unreliable. First, [the physician] fails to rule in the molds found in the apartment—specifically Aspergillus, Cladosporium, and Penicillium—as possible causes for [the plaintiff's] allergy and flu-like symptoms because [the plaintiff] was not allergic to these molds." Roche, 278 F. Supp. 2d at 751; see also Flores v. Allstate Texas Lloyd's Co., 229 F. Supp. 2d 697, 70 (S.D. Tex. 2002) (excluding testimony from physician that plaintiffs' condition was caused by exposure to indoor mold because physician failed to base his testimony "on any testing done to determine whether Plaintiffs are allergic to any specific type of mold found in their home"). Such negative results from the allergy testing of Ms. Jazairi similarly renders Dr. Johanning's methodology scientifically invalid and unreliable.[7]

Dr. Johanning's differential diagnosis is similarly flawed because he ignored test results which are contrary to his opinion that Ms. Jazairi's lung condition was caused by mold exposure. Ms. Jazairi's primary treating physician, Dr. Patricia Costanzo,[8] performed "pulse oximetry" testing on a number of occasions in order to measure Ms. Jazairi's oxygenation and the results of such tests were "pretty much normal. All of them are where I would expect a person to be under

---

[7] To the extent that Dr. Johanning's causation opinion is primarily based on the purported temporal proximity between Ms. Jazairi's alleged mold exposure and the onset of her symptoms, such a reliance on temporal causation as the determinative factor in his analysis "is suspect because 'it is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Rule 702.'" Roche, 278 F. Supp. 2d at 752; (Harbison Aff. at ¶ 19, Apx. H).

[8] Dr. Costanzo is a pulmonologist who treated Ms. Jazairi from October 2002 until July 2004.

normal circumstances." (11/22/04 Deposition of Dr. Patricia Costanzo (hereafter "Costanzo Dep.") at pp. 17-18, Apx. L). Dr. Costanzo also performed a "fiberoptic bronchoscopy"[9] in February 2003 and the bronchoscopy was "essentially unremarkable" and discovered *no* evidence of fungal growth. (Costanzo Dep. at pp. 21-24, Apx. L; Exs. 62 and 63 to Costanzo Dep., Apx. M and N). Dr. Costanzo found that the results of the bronchoscopy were indicative of chronic bronchitis caused by cigarette smoking (Costanzo Dep. at p. 22, Apx. L), and Dr. Costanzo eventually concluded that, based on her exam, testing, and treatment, Ms. Jazairi's lung condition and chest symptoms were asthmatic bronchitis caused by cigarette smoking:

A.    . . . I see no reason to blame any other disease process other than asthmatic bronchitis due to cigarette smoking for the chest symptoms in the patient. I do not understand why she is focusing so much on this fungal exposure. I cannot imagine what fungal disease would linger and cause all of the symptoms she is complaining of. It is not clear that she ever had any interstitial lung disease, although initially her chest x-ray was suggestive of it. . . .

Q.    And was that what you just read, was that your impression as of July 20th, 2004?

A.    It was . . .

Q.    And have you reached that opinion based on a reasonable degree of medical certainty?

A.    Yes.

Q.    And if you could just describe for me generally how you reached that opinion.

A.    She was wheezing, coughing. She had mucus. Her chest x-ray had gotten better. There was no indication on the pulmonary function test of an interstitial lung problem, which is usually manifested with low lung volumes and sometimes diffusion abnormalities.

      It all fits. This is what I see – 80 percent of what I see in my private practice is asthmatic bronchitis, and I see it over and over and over again.

---

[9] In a bronchoscopy, a scope is inserted through the nostrils and into the lungs so that the doctor can observe and take samples from the patient's lungs. (Costanzo Dep. at p. 18, Apx. L).

A.     And you've been practicing close to 25 years?

Q.     Correct.

(Costanzo Dep. at pp. 40-43, Apx. L; 7/20/04 Exam Notes at p. 2, Apx. O).[10]

Dr. Johanning's failure to account for the results of the bronchoscopy and oximetry testing of Ms. Jazairi, and his failure to properly rule out asthmatic bronchitis and Ms. Jazairi's over twenty-year history of cigarette smoking as causes of her lung condition, render Dr. Johanning's differential diagnosis and causation opinion scientifically invalid and inadmissible. (Harbison Aff. at ¶¶ 14, 19, Apx. H). In Everett v. Georgia-Pacific Corp., 949 F. Supp. 856, 859 (S.D. Ga. 1996), this Court excluded proposed expert testimony from a physician regarding causation of a plaintiff's bronchitis and chronic obstructive pulmonary disease because, *inter alia*, the expert "did not eliminate other causes of bronchitis and COPD, such as smoking, allergies, or working in a heavy industry, as possibilities." Id. at 859; see e.g. Wills v. Amerada Hess Corp., 379 F.3d 32, 50 (2nd Cir. 2004) ("[w]e agree with the district court that Dr. Bidanset's failure to account for decedent's smoking habit and alcohol consumption as possible causes of decedent's [cancer], strongly indicated that Dr. Bidanset's conclusions were not grounded in reliable scientific methods, as required by Daubert").

Similarly, in Flores v. Allstate Texas Lloyd's Co., 229 F. Supp. 2d 697 (S.D. Tex. 2002), the court excluded expert testimony from a physician that the plaintiffs' allergic health effects were caused by their exposure to household mold. In concluding that the proposed testimony was not sufficiently reliable under Daubert, the court in Flores repeatedly emphasized that the physician failed "to provide any evidence that a particular mold in the house had a greater

---

[10] Dr. Costanzo prescribed medications for Ms. Jazairi's breathing and chest problems, however, Ms. Jazairi failed to take the medications and Dr. Costanzo believed that such failure was because "she wants to continue having symptoms to try to make a case for this fungal infection." (7/20/04 Exam Notes at p. 2, Apx. O; Costanzo Dep. at pp. 27-31, 44-45, Apx. L).

possibility than cigarettes, dust mites, fibers, huisache, mesquite, or any other number of present environmental allergies, of causing health effects [in the plaintiffs]." Id. at 702. Thus, the court in Flores concluded that the physician's "failure to account for other factors that may have caused Plaintiffs' health problems renders his opinion uncertain and unreliable because it prevents the fact-finder from determining the extent to which household mold—rather than other elements—caused Plaintiff's alleged injuries." Id. at 702-703 ("An expert's failure to consider, or control for, other explanatory variables is fatal to the reliability of his testimony").

Finally, although Dr. Johanning testified that "there could be other" potential causes of Ms. Jazairi's lung condition (Johanning Dep. at p. 119, Apx. D), he failed to properly rule out such other potential causes. Ms. Jazairi has lived with two dogs for years and lived outside in a "tent compound" on undeveloped property in Tattnall County for over eight months from September 2002 until mid-2003 (Jazairi Dep. at pp. 93-94, Apx. A; Potter Dep. at pp. 7-9, Apx. P), yet Dr. Johanning failed to test for, or rule out, common allergens such as dog hair, pollen, grass, trees, and outdoor mold species. (Johanning Dep. at pp. 107-108, Apx. D). In fact, Dr. Costanzo, Ms. Jazairi's primary treating physician, described Ms. Jazairi as "a good candidate for allergy testing" (Costanzo Dep. at p. 38, Apx. L), and Ms. Jazairi stated to Dr. Costanzo that her symptoms were better when she temporarily moved to Nebraska (and away from the allergens of south Georgia). (2/19/03 Exam Notes, Apx. Q). In addition, Dr. Costanzo specifically noted Ms. Jazairi's reported consumption of four ounces of hard alcohol a day, Ms. Jazairi's complaints of a "folic acid deficiency," and that folic acid deficiency is associated with alcoholism. (7/20/04 Exam Notes, Apx. O; Costanzo Dep. at pp. 37-40, Apx. L). Although Dr. Johanning testified that Ms. Jazairi's alcohol consumption "may have contributed to some of the other symptomatology," Dr. Johanning does not think it was a cause or contributor to her lung

24

condition. (Johanning Dep. at pp. 125-26, Apx. D). However, Dr. Johanning could not identify any objective reason for ruling out alcohol as a cause of Ms. Jazairi's lung condition, and thus he failed to properly rule it out. (Harbison Aff. at ¶¶ 19-20, Apx. H).[11] In addition, the physician reviewing Ms. Jazairi's August 2004 pulmonary function testing related any restriction in her breathing to "obesity effect" (8/5/04 PFT Results, Apx. GG; Costanzo Dep. at pp. 85-86, Apx. L), yet Dr. Johanning failed to properly consider that issue. (Johanning Dep. at pp. 96-97, 125, Apx. D). Therefore, Dr. Johanning's failure to properly rule out common allergens, cigarette smoking, alcohol, and obesity as potential causes of Ms. Jazairi's alleged condition is yet another reason that his differential diagnosis and causation opinion are invalid and inadmissible. Everett, 949 F. Supp. at 859; Roche, 278 F. Supp. 2d at 761-63; Flores, 229 F. Supp. 2d at 702.

## C.   **Conclusion**

For the foregoing reasons, Defendants respectfully request that the Court exclude the specific causation testimony of Dr. Johanning.

This ___11th___ day of ___February___, 2005.

SMITH, GAMBRELL & RUSSELL, LLP

Suite 3100, Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309-3592
Telephone: (404) 815-3500
Facsimile: (404) 815-3509

Stephen E. O'Day
Georgia Bar No. 549337
Andrew M. Thompson
Georgia Bar No. 707319

Counsel for Defendants Royal Oaks Apartment
Associates, L.P. and Mitchell L. Morgan Management, Inc.

---

[11] Ms. Jazairi's designated expert witness Doug Haney opined that, in his opinion, individuals exposed to indoor mold demonstrate "extremely similar neurological and pathological effects" as smokers and drinkers. (Haney Dep. at pp. 133, 146-47, Apx. C).

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

CHRIS JAZAIRI,                              )
                                            )
            Plaintiff,                      )
                                            )
vs.                                         )       Civil Action File
                                            )       No. CV-404-091
ROYAL OAKS APARTMENT                        )       Judge B. Avant Edenfield
ASSOCIATES, L.P., and MITCHELL L.           )
MORGAN MANAGEMENT, INC.,                    )
                                            )
            Defendants.                     )
_____)

## CERTIFICATE OF SERVICE

I hereby certify that I have served all parties with the within and foregoing **Defendants'**

**Motion To Exclude Specific Causation Testimony from Dr. Eckardt Johanning** and

**Defendants' Memorandum In Support Of Their Motion To Exclude Specific Causation**

**Testimony from Dr. Eckardt Johanning** on the date shown below by depositing a copy of

same in the United States Mail, First Class postage prepaid, in an envelope addressed as follows:

> Eugene C. Brooks, IV, Esq.
> Brooks Law Firm
> 313 West York Street
> Post Office Box 9545
> Savannah, Georgia 31412

This _11th_ day of _February_____, 2005.

_____
Andrew M. Thompson