IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

*K Stephe*

CHRIS JAZAIRI,                      )
                                    )
            Plaintiff               )
VS.                                 )        CIVIL ACTION
                                    )        FILE NO.: CV-04-404-091
ROYAL OAKS APARTMENT                )
ASSOCIATES, L.P., Its Parent Company )
 And Subsidiaries, And              )
MITCHELL L. MORGAN                  )
MANAGEMENT, INC.,                   )
            Defendants              )

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION TO EXCLUDE SPECIFIC
CAUSATION TESTIMONY FROM DR. ECKARDT JOHANNING**

**I.     STATEMENT OF FACTS**

On August 3, 2002, Plaintiff went to a hospital emergency room with shortness of breath and

malaise  Exhibit 1.  Her chest x-rays of August 19, 2002 were abnormal, with interstitial thickening

bilaterally.  Exhibit 2.  On September 16, 2002, she was seen by Robert Remler, M.D., who

confirmed that Plaintiff had an ongoing pulmonary illness.  Exhibit 3  Dr Remler did not determine

the specific cause of her problem but hypersensitivity pneumonitis [HP] resulting from indoor mold

exposure was part of his working differential diagnosis.  Id.  Dr. Remler recommended that Plaintiff

move away from the source of her mold exposure.   Jazairi Depo at 60, Exhibit 4.  Plaintiff's chest

x-rays of September 16, 2002 again showed prominent interstitial lung markings bilaterally.  Exhibit

5. Dr. Remler noted on October 8, 2002 that the CT scan confirmed pulmonary fibrosis with ground

glass opacities.  Exhibit 6.  Dr. Remler then referred Plaintiff to Dr. Costanzo, a pulmonologist.  Id.

Dr. Costanzo saw Plaintiff on October 24, 2002 and noted that Plaintiff's symptoms of

shortness of breath began in August, 2002 and that Plaintiff had abnormal chest x-rays and chest CT

*62*

scan.  Dr. Costanzo noted Plaintiff's interstitial lung disease and considered the following working

diagnoses: chronic hypersensitivity pneumonitis [HP], sarcoidosis, eosinophilic granuloma, lung

disease associated with dermatomyositis and collagen vascular disease.  Exhibit 7.  The pulmonary

function tests of October 24, 2002 demonstrated mild restrictive and mild diffusion abnormalities

Exhibit 8.  Plaintiff's chest x-rays of February 19, 2003 showed prominent vascular and interstitial

markings bilaterally with some improvement.  Exhibit 9

Plaintiff's pulmonary function tests (PFT's) of February 26, 2003 showed some

improvement.  Exhibit 10  Plaintiff's chest x-ray of February 28, 2003 again showed interstitial lung

disease [ILD].  Exhibit 11.  Dr. Costanzo also performed a bronchoscopy on February 28, 2004

which was suggestive of chronic bronchitis.  Exhibit 12.

At approximately this time, Plaintiff's roommate, David Potter learned of Eckardt Johanning,

MD on the internet. Potter Depo., Exhibit 13 at 45.  David Potter was very concerned for their health

because they had lived in an apartment contaminated with mold.  Plaintiff answered a lengthy

questionnaire from Dr. Johanning's office on her health history on March 12, 2003.  Then Plaintiff

and David Potter drove to Albany, New York and were examined by Dr. Johanning on March 27,

2002.  Id. at 47.

Dr. Johanning took a lengthy history from Plaintiff, examined her, and ordered testing when

he saw her on March 27, 2002. Johanning Depo., Exhibit 14 at 74, 77, 83-84, 87, 89  Johanning's

chart documents the repeated calls that Plaintiff made to Johanning's office to check on the test

results. Exhibit 16.  Plaintiff considers Dr. Johanning a treating doctor.  Jazairi Depo., Exhibit 4 at

47.  She waits for direction from his office on her pulmonary condition regarding how she should

proceed with medical treatment  Id.

Dr. Johanning saw Plaintiff again on November 5, 2004. Johanning Depo., Exhibit 14 at 72-73. Dr. Johanning diagnosed Plaintiff with a HP-type syndrome, an inflammatory lung disease also known as extrinsic allergic alveolitis, from exposure to microbials in her apartment. Id. at 73-74,111-112. Dr Johanning had reviewed the findings of the Chatham County Department of Health and the report from the industrial hygienist that both confirmed atypical mold exposure in the apartment. Id. at 43-44, 52, 72.

Prior to his subpoenaed deposition, Dr. Johanning was sent a check from Plaintiff's counsel for $3,000 to cover cost of record review and consultation in preparation for his scheduled deposition. Id at 69. Dr. Johanning understood that he would be deposed on his findings involving his treatment of Plaintiff. Johanning Depo., Exhibit 14 at 67. Dr. Johanning was deposed by defense counsel on December 2, 2004 in a deposition that lasted most of the day.

## II.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Dr. Johanning Was Not A Specially Retained Expert As Defined Under Rule 26(a)(2)(B)

Dr. Johanning does not satisfy either of the two definitions in subsection (a)(2)(B) that require a written report because he is a treating physician. Rule 26(a)(2)(B), F R.Civ.P. Plaintiff considers him a treating physician. Jazairi at 47. She repeatedly referred to Dr. Johanning's recommendations for testing and treatment during her deposition. Jazairi at 47, 55, 70, 239-40. Dr Johanning's records show that Plaintiff repeatedly contacted his office. Exhibit 16.

Rule 26 requires that all expert witnesses be disclosed. Rule(a)(2)(A), F.R. Civ. P. However, a detailed report is only required from "a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve

giving expert testimony...". Rule 26(a)(2)(B), F.R.Civ.P.   Treating physicians are not included in the definition of specially retained litigation experts  Rule 26, Advisory Comm. Notes 1993 Amendments at subd. (a) para. (2).  The committee wrote the following: "The requirement of a written report in paragraph (2)(B), however, applies only to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony.  A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report." Id.

Defendant's reliance on the <u>Jack</u> opinion is misplaced  In <u>Jack</u>, a Plaintiff sought to call an expert on the ability of a drug, Zyban, to cause a particular injury  <u>Jack v Glaxo Wellcome, Inc.</u>, 239 F.Supp.2d 1308, 1318-19 (N.D. Ga. 2002).   This expert had not treated or ever seen the Plaintiff. <u>Id</u>. The 11th Circuit requires a written report if the expert does not have first-hand knowledge of the facts and simply bases his opinion on review of reports  <u>Prieto v Malgor</u>, 361 F.3d 1313, 1318-19 (11th Cir. 2004).

Courts have routinely held that a treating physician who considers diagnosis, prognosis and causation is not an expert from whom a written report is required. <u>Brown v Best Foods</u>, 169 F.R.D. 385, 88-89 (N.D. Ga  1996) <i>citing</i> <u>Salas v U.S.</u>, 165 F.R.D  31, 33 (W D. N.Y. 1995); <u>Baker v Taco Bell Corp.</u>, 163 F R.D. 348 (D. Colo. 1995); <u>Harlow v Eli Lilly Co</u>, 1995 WL 319728 (N.D. Ill. 1995)  It is only when the treating physician's testimony extends beyond that usually contemplated during treatment, such as reviewing records to testify on the standard of care, that a written report is necessary. <u>Id</u>. <i>citing</i> <u>Salas</u> 165 F R.D. at 33; <u>Wreath v U.S.</u>, 161 F R.D  448, 450 (D. Kan. 1995).

Dr Johanning is not expected to testify on the standard of care. He is testifying as a treating physician with opinions on diagnosis, prognosis and causation that he developed during his treatment

of Plaintiff. Plaintiff also sought treatment from other doctors for her mold condition, including Robert Remler, M.D. and Patricia Costanzo, M.D. of Savannah, Ga. and Allen Lieberman, M.D. of Charleston, S.C. Dr. Remler considered a diagnosis of HP and advised Plaintiff that she should move out of Apt. 1607 due to mold exposure as a possible cause. Jazairi Depo., Exhibit 4 at 60. Dr. Lieberman also believed that Plaintiff suffered from mold-induced illness Exhibit 17. Dr. Costanzo initially considered HP. Exhibit 7

Plaintiff and her roommate David Potter drove to Dr Johanning's office in Albany, New York in March of 2003 for specialty treatment of their respective illnesses that they thought might be related to mold exposure. Potter Depo., Exhibit 13 at 45-48 They paid Dr. Johanning for their treatment and he recommended testing for them. The charge for this initial visit was $550. Exhibit 19 at 1. Plaintiff had the testing performed in Savannah and the test results were sent to Dr Johanning. Jazairi at 50–52.

Subsequently, Plaintiff returned to see Dr. Johanning on November 5, 2004 and was charged $175.00 for this office visit. Exhibit 19 at 2. Dr. Johanning determined that she suffered from an allergic lung inflammation that was associated with mold spore exposure from the mold that was identified in her apartment by the Chatham County Dept. of Health [CCDH]. Johanning Depo, Exhibit 14 at 73-74, 112-112. The primary treatment for Plaintiff's condition is avoidance of exposure to molds that may trigger a reoccurrence of the lung condition Id. at 131-32. Plaintiff is following this medical advice. Jazairi Depo., Exhibit 4 at 47, 55, 70, 239-40. Dr. Johanning would have been a witness to the case regardless of whether he submitted a report as a specially retained expert. Dr. Johanning was listed as a potential expert witness as a treating doctor pursuant to Rule 26 subsection (a)(2)(A).

Defendant subpoenaed Dr. Johanning for a deposition.  At that time, Plaintiff paid a fee of $3,000 to Dr. Johanning to compensate him for a thorough review of the Plaintiff's medical records in preparation for the anticipated thorough deposition and to speak with Plaintiff's counsel prior to his deposition taken on December 2, 2004.  The transmittal letter speaks for itself  Exhibit 20   Dr Johanning understood that he would be asked to testify on his findings and treatment of Plaintiff Johanning Depo., Exhibit 14  at 67.

Dr. Johanning's participation is the same as that of Dr. Costanzo and the other treaters. Defendant has not submitted a Rule 26 report from Dr. Costanzo or the other treating doctors.  Rule 26 anticipates that not all expert witnesses will prepare reports. Brown, 169 F.R.D. at 387 citing Smith v State Farm Fire and Cas. Co., 164 F.R.D. 49, 55 (S.D. W. Va. 1995); Wreath, 161 F.R.D. at 449.   Dr. Johanning is the type of expert from whom no expert witness report is required. Id.

**B.      Rule 702, FRE Allows the Admission of Relevant and Reliable Testimony of a Treating Medical Doctor On Issues of Diagnosis, Prognosis and Causation**

The trial Court has discretion to determine whether testimony satisfies the requirements of reliability under Rule 702, F.R.E. Rider v Sandoz Pharmaceuticals Corp., 295 F 3d 1194, 1197 (11th Cir. 2003) citing Daubert v Merrell Dow Pharm , 509 U.S. 579, 593-94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  The trial court does not have discretion to avoid ruling.  McClain v. Metabolife International, Inc., No. 03-12776, 2005 WL 477861, 5 n. 6 (11th Cir. 2005).

The Daubert test on reliability is flexible. Kumho Tire Co  v Carmichael, 526 U.S. 137, 141, 150, 119 S.Ct. 1167, 1170, 1171, 1175,  143 L.Ed.2d 238 (1999).  The trial Court has broad discretion in determining both how to decide reliability and the issue of reliability. Kumho Tire, 526 U.S  at 141-

42 *citing* General Electric Co. v Joiner, 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); U.S. v Frazier, 387 F 3d 1244, 1258-59 (11th Cir. 2004) [en banc].

Expert testimony is admissible if: (1) the expert is qualified; (2) the methodology is reliable; and (3) the testimony assists the trier of fact. Rule 702, F R.E ; Allison v McGhan Medical Corp., 184 F.3d 1300, 1309(11th Cir. 1999). The primary focus of the trial Court's reliability analysis should be on the methodology used to reach an opinion and not on the conclusion Allison, 184 F 3d at 1312. The proponent is not required to prove that the proffered testimony's conclusion is correct, but that, by a preponderance of the evidence, the testimony is reliable. Id. The burden of establishing probable reliability rests on the proponent of the evidence. Frazier, 387 F.3d at 1260.

The factors listed in Daubert for consideration of reliability may not be pertinent in assessing reliability in certain cases. Kumho Tire, 526 U.S. at 150. Each case will be different and "too much depends on the particular circumstances of the particular case at issue" to establish set requirements. Id. at 150. For instance, the absence of peer review of a scientist's claim would not preclude the scientist's testimony. Id. at 151. An expert may base his testimony purely on his experience based learning. Id. The Supreme Court used the example of a perfume sniffer as someone who may have acquired reliable knowledge through experience. Id. An expert must employ the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Id. at 152; U.S. v Frazier, 387 F.3d at 1260. There is no bright line exclusionary test. Id. at 1262 *citing* Heller v Shaw Indus. Inc., 167 F.3d 146, 155 (3d Cir. 1999).

In Heller, a homeowner suffered respiratory illness after a carpet was installed in her home. Heller, 167 F.3d at 153-54. The District Court excluded the testimony of the treating doctor but the Third Circuit reversed. In Heller, the plaintiff had sought treatment for her respiratory illness from

-7-

a board-certified allergist.  The allergist examined the plaintiff, reviewed a series of results from medical tests, reviewed her family and personal medical history, considered plaintiff's personal activities such as smoking and her environmental conditions.  The allergist considered the temporal relationship between plaintiff's exposure and the onset of symptoms.  Also, the allergist considered the environmental testing results of the plaintiff's home  Finally, the allergist relied on his expertise as a physician.  The district court excluded his testimony because the allergist had not identified any studies that indicated the levels of exposure that would cause Plaintiff's symptoms.  Furthermore, the district court found that the allergist had failed to discount all other possible causes of illness. Id. at 154.

The Third Circuit found that the lack of studies that documented the specific levels of exposure to VOC's [volatile organic compounds] was an inadequate basis to exclude the allergist's testimony when he had performed an adequate differential diagnosis and a temporal relationship existed between the plaintiff's exposure and symptoms. Id. at 154.  Both the Third and Second Circuits have looked favorable on medical testimony that relies heavily on temporal relationships between illness and causal events. Id.  Definitive published studies concerning exposure levels to particular chemicals or substances are not required. Id. Similarly, the Ninth Circuit does not require epidemiological studies. Id. citing Kennedy v Collagen Corp., 161 F.3d 1226, 1229 (9th Cir. 1998); but see Moore v Ashland Chem. Inc., 151 F.3d 269, 278 (5th Cir. 1998).  The 11th Circuit also does not required epidemiological studies to prove causation and is in step with the majority of circuits, including the Third Circuit. Rider v Sandoz Pharma Corp., 295 F.3d 1194, 1198 (11th Cir  2002); Frazer, 387 F.3d at 1262 citing Heller, 167 F3d at 146

-8-

The Third Circuit recognized that in the actual practice of medicine, doctors do not wait for conclusive studies. Rather, doctors rely on their experience with hundreds of patients, discussions with peers, attendance at conferences, and detailed review of a patient's personal and medical histories and physical examinations. These tools of the doctor's trade suffice for the making of a differential diagnosis even when peer-reviewed studies do not exist. Heller, 167 F 3d at 155. A doctor is not required to conduct every possible test to rule out all possible causes so long as he uses sufficient diagnostic techniques that support his conclusion. Id

The Fourth Circuit has also noted that an overwhelming majority of Circuits have held that a reliable differential diagnosis satisfies Rule 702. Westberry v Gummi, 178 F.3d 257, 263 (4th Cir., 1999). In Westberry, a doctor's diagnosis was attacked because he could not "rule in" talc as a cause of sinus disease and failed to "rule out" other possible causes Id. at 263. Defendant argued that the doctor could not "rule in" talc because he had no means of accurately assessing an injurious level of exposure. Id. The court noted that actual exposures of injured persons are rarely quantified Id. at 264 citing Federal Judicial Center, Reference Manual on Scientific Evidence 187 (1994). Therefore, a medical opinion on causation can be formed without specific knowledge of the level of exposure. Id. citing Heller, 167 F 3d at 157. Westberry also recognized the importance of a temporal relationship between exposure and onset of disease. Id. at 265. Furthermore, the failure of the doctor to rule out all potential causes, when certain other causes were ruled out, affected the weight of the evidence and not its admissibility. Id.

Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. Daubert 509 U.S. at 596. The Supreme Court envisioned cases in which expert testimony

-9-

was admissible under Rule 702, but may not carry the Plaintiff's burden of persuasion in trial. Heller, 167 F.3d at 152.

### C. The Methodology of Clinical Medical Opinions Require a Patient History, Physical Examination, and Appropriate Testing

Medical testimony has also been addressed by the Federal Judicial Center. M. Henifin, et al "Reference Guide on Medical Testimony", Reference Manual on Scientific Evidence, 439 (Federal Judicial Center 2d ed. 2000). Doctors are expected to testify on issues of diagnosis, prognosis and causation Id. at 451. Doctors are expected to rely on patient history as a primary and most useful tool in the practice of clinical medicine. Id. at 452. The history is important in determining the patient's condition, the medical tests that should be ordered, the diagnosis and the course of treatment. Seventy percent (70%) of a patient's significant problems can be determined by history, including a questionnaire Id. at 452-53.

A physical exam by the doctor can determine twenty percent (20%) of a patient's significant problems. Id. at 455. Review of signs, such as blood tests and x-rays are important objective signs that the doctor must use his skill to interpret in consideration of the patient's reported symptoms. Id. These tests are useful for a doctor to confirm his diagnosis. Id at 457.

In a clinical diagnosis, the doctor is first to determine viable working diagnoses and use the differential diagnostic method to determine the possible diseases that can produce the patient's signs and symptoms. Id. at 463. Medical diagnosis is not an exact science. Id. at 464-65. Doctors combine probability of disease with their knowledge of the signs and symptoms to consider competing causes and ultimately arrive at the likelihood of a particular diagnosis. Id. at 467. It is a process of refinement. Id. at 468; See also Daly Affidavit at Exhibit 32.

-10-

### D.        Dr. Johanning's Testimony Satisfies Rule 702

#### 1.        Dr. Johanning is A Qualified Medical Doctor

Dr. Johanning is the medical director of the Eastern New York Occupational and Environmental Health Center and, furthermore, is director of Fungal Research Group, Inc. Johanning Depo., Exhibit 14 at 10.   He is board certified in family practice and occupational/environmental medicine.   Id. at 22   He has training in allergy, toxicology, microbiology, pulmonology and industrial hygiene. Id at 22   He has performed government funded research on microbiology and pulmonology and has written scientific journals and book chapters on the subjects, including epidemiological studies. Id. at 23-25   He has been an adviser to the Center for Disease Control and NIOSH on epidemiological issues. Id. at 25.   Dr. Johanning was a presenter on clinical issues during the National Academies of Sciences investigation that resulted in the publication Damp Indoor Spaces and Health, 334 (2004). Dr. Johanning is an international medical authority who has co-authored many articles in English language peer-reviewed journals and books concerning mold related injury on mold-induced disease  Johanning CV at Exhibit 21; Johanning Depo., Exhibit 14 at 55.

Dr. Johanning satisfies the qualification requirement of Rule 702. By contrast, Dr. Harbison, a toxicologist whose affidavit has been submitted by Defendant, is not qualified to question Dr. Johanning's diagnosis. Dr. Harbison is not a medical doctor. Dr. Harbison has not legally diagnosed or tested anyone with anything in this entire professional life.  Dr. Harbison does not utilize the methodology of differential diagnosis.   Dr. Harbin has no legal standing under Kumho Tire to question the intellectual rigor that Dr. Johanning has utilized in reaching his opinion.   Defendant has failed to carry its burden of creating an issue on the reliability of Dr. Johanning's methodology.

2.  **Dr. Johanning's Opinion Is Supported by Reliable Scientific Literature And Generally Accepted Medical Knowledge**

i.  **Other Treating Doctors Recognized Mold Induced Hypersensitivity Pneumonitis As A Reasonable Diagnosis**

Dr. Costanzo recognized that mold exposure is usually by inhalation of mold spores and that it is common medical knowledge that mold exposure can cause pulmonary injury. Costanzo Depo., Exhibit 18 at 82-83. Also, Dr. Costanzo recognized that a person's lungs can become inflamed due to a hypersensitivity process. Id. at 83-84. Also, Dr. Costanzo admitted that she had initially diagnosed Plaintiff with interstitial lung disease and that she had carried that diagnosis on Plaintiff's chart for over a year. Id. at 63-64, 69, 71-72, 77. As late as February 19, 2003, Dr. Costanzo stated that Plaintiff may have a lung disease from fungal exposure. Exhibit 22

Dr. Robert Remler, who had seen Plaintiff before Dr Costanzo, had also diagnosed ILD and suspected HP. Exhibit 3. In his note of October 8, 2002, Dr. Remler noted that the CT chest scan confirmed pulmonary fibrosis with ground glass opacities and referred Plaintiff to Dr Costanzo Exhibit 5. The medical literature recognizes interstitial lung disease with ground glass opacities shown by high resolution chest CT scan as consistent with a HP diagnosis. Exhibit 23 at 219.

Dr. Costanzo diagnosed Plaintiff with interstitial lung disease [ILD] when she first examined Plaintiff and considered HP as the cause of Plaintiff's illness. Costanzo Depo., Exhibit 18 at 63-64, 69, 71-72, 77. Plaintiff's PFT's continued to demonstrate a restrictive pattern on October 24, 2002. Exhibit 7. In February of 2003, Plaintiff's lung x-rays still showed interstitial lung disease. Exhibit 8. Medical literature recognizes restrictive lung disease as shown by PFT's and interstitial lung disease as consistent with a HP diagnosis. Exhibit 23 at 219.

ii.   **Medical Literature Recognizes Mold Induced Disease Without Exact Quantification of the Amount of Mold Exposure**

Defendant attacks Dr Johanning's opinion based on exposure evidence, however, Dr. Johanning explained repeatedly that Plaintiff was not part of a scientific study.  Johanning Depo., Exhibit 14 at 60, 143, 150-51.  The type of exposure information that would be necessary for a strict scientific study was not generated  Id. at 60.  Nevertheless, there was a adequate information to reach a clinical diagnosis.  Id. at 147.

Plaintiff did not have any significant medical history prior to moving into the apartment.  Id at 101.  The presence of visible mold was confirmed in the apartment by the CCHD, and by photographs.  Id. at 57, 70.  Dr. Johanning reviewed the report of the industrial hygienist.  Id. at 72. He reviewed the laboratory analysis of the bulk mold samples that were collected by the CCHD.  Id. at 57  This data indicated an abnormal indoor exposure to mold.  Id. at 111-12.

There was a route of exposure to Plaintiff before and during the apartment's mold remediation.  Id. at 142, 145.  Plaintiff lived and worked in the apartment.  Id. at 146.  Mold releases mold spores into the air that move with the air  Id. at 143.  Plaintiff likely inhaled the mold spores.  Id.

The diagnosis of mold-induced HP does not require that the amount of mold exposure be quantified.  See R. Story, et al, Hypersensitivity Pneumonitis, *Allergy and Asthma Proc.*, Vol. 25, No. 4 at S40-S41  (July-August 2004) [Exhibit 24]; Greenberger, Mold-Induced Hypersensitivity Pneumonitis, *Allergy and Asthma Proc.,* Vol. 25, No. 4 at 219-223 (July-August 2004) [Exhibit 23]. In both of these peer-reviewed articles, the exposure to mold is acknowledged as a causative factor of HP, also referred to as extrinsic allergic alveolitis. Story supra  at S40; Greenberger supra  at 220

-13-

at Tables I and II. Both of the articles note that the illness is not IgE mediated and so typical allergy skin testing for allergy is not diagnostic. Id. Dr. Harbison makes much of the normal IgE testing, however, IgE testing is not relevant to the injury suffered by Plaintiff except for the purpose of discounting IgE mediated allergies, which the testing did discount. Plaintiff's illness was not caused by IgE antibodies but by IgG antibodies. See Nordness, et al. "Toxic and Other Non-IgE-mediated Effects of Fungal Exposures," *Current Allergy and Asthma Reports*, 3:438-446 (2003) [Exhibit 25].

Diagnostic findings supportive of mold-induced HP include the following: (1) history of mold exposure; (2) symptoms of cough, fever,  shortness of breath or muscle pains; (3) abnormal chest CT imaging studies with findings of nodular infiltrates, ground glass opacities or interstitial fibrosis; (4) precipitant to mold antigens; (5) restrictive pulmonary function tests or decreased diffusing capacity; and (6) lung biopsy. Greenberger, supra Table IV at 211.  Not all of these symptoms and findings are necessary to make a diagnosis of HP, particularly the lung biopsy. Id.  The Greenberger article notes that significant diagnostic expertise is necessary to make the diagnosis of mold-induced HP. Id , *see also* Fink JN, "Hypersensitivity Pneumonitis", Allergy Diseases, 543, 551 (5th ed. 1997) [Exhibit 26]. Dr. Fink's description of a HP diagnosis of a HP diagnosis includes "History: Suspicious of environmentally induced symptoms."   Id.

Plaintiff satisfies the medically recognized criteria for HP diagnosis.  She has a history of mold exposure in her apartment at the time of her initial symptoms.  She suffered cough, rhinitis, shortness of breath and malaise. Johanning at 118.  She had an abnormal chest x-ray with interstitial markings and subsequent abnormal chest CT imaging studies with reported findings of interstitial fibrosis with ground glass opacities.  Id. at 95.  She tested positive to a precipitating IgG antibody

in the HP panel   Id. at 87.  Her pulmonary function tests demonstrated a restrictive pattern. Id. at 90.
She also had a decreased diffusing capacity.   Tabs 8, 10.

Improvement is expected when a patient is removed from the offending exposure.  Story,
supra at S40.  Plaintiff did improve when removed from exposure. Johanning Depo., at 95-96, 111-
12, 151.  Exhibit 14.

One of the books cited by Defendant also recognizes HP as a mold-induced illness.
Bioaerosols, Assessment and Control (1999) at Table 3.2 at 3-3 to 3-5 [Exhibit 27]. It is noted that
often the precise mold that has caused a person's HP cannot be established. Id. at 3-7.  Furthermore,
once a person has HP, they may be permanently restricted from certain environments because they
are likely to react to extremely low levels of antigen material in the future. Id.

Additionally, the IOM book referred to by Defendant addresses HP by stating in the topical
conclusion that, "Studies reviewed by the committee indicate that there is sufficient evidence of an
association between the presence of mold and bacteria in damp indoor environments and
hypersensitivity pneumonitis in such people" (i e  susceptible people).  Damp Indoor Spaces and
Health 231 (2004) [Exhibit 28] .

Furthermore, a 2001 case report  from the CDC addressed a situation similar to Plaintiff's.
See  Trout, et al, Bioaerosol Lung Damage in a Worker with Repeated Exposure to Fungi in Water-
Damaged Building, Environ Health Perspectives 109:641-644 (June 2001) [Exhibit 29].  The case
report describes a 48 year old worker who developed cough, fever and shortness of breath when
assessing rooms for water damage.  His PFT's demonstrated a restrictive pattern.  Precipitating
antibodies were found to Thermoactinomyces. Specific antibodies to stachybotrys IgG and IgE were

normal. Transbronchial biopsy was unremarkable. Id. at 641-42. Plaintiff in the matter *sub judice* has very similar findings, except that she also has abnormal x-rays.

In the case report, numerous molds were identified from bulk samples including several species of Aspergillus, Alternaria and Stachybotrys Id at 642 The authors noted that bulk sampling was the standard used to associate health effects with mold exposure. Id at 643. The worker was noted to have many HP symptoms. The CDC authors then presented an algorithm for determination, after an infectious cause was ruled out, of whether a person had developed pneumonitis or asthma from mold exposure. Id. at 644. This algorithm for pneumonitis included chest x-rays with interstitial infiltrates and restrictive PFT's, both of which Plaintiff has. Id. Johanning Depo., Exhibit 14 at 78, 95.

Dr. Johanning confirmed that Plaintiff was living in an environment that was conducive to mold growth. Id. at 44. Dr. Johanning took an exposure history from Plaintiff. Id. at 54. He also reviewed the CCDH report that included facts of the apartment investigation and analysis of the bulk samples Id. at 57. The HVAC system was reported to have been contaminated. Id at 134. Also, the ceiling was wet with a heavy growth of mold suggested to be "stachy" (i.e. stachybotrys) that was under the wallpaper, in the ceiling and in the trim. Id. The existence of the stachybotrys demonstrates a chronic water leak. Id. Heavy mold growth was found behind the walls. Id. at 137. The contaminated area was contained during remediation. Id. at 137, 142. The mold spores would have been airborne. Id. at 143-44. Since Plaintiff both lived and worked in her home, she had continuous exposure although the exposure would have varied during the day. Id. at 145-46.

Admittedly, the testing performed by the CCDH did not discover the entire spectrum of Jazairi's exposure. Johanning Depo., Exhibit 14 at 112. However, the test results were adequate

to demonstrate an atypical exposure to the residents of the apartment. Id. Basically, Plaintiff was exposed to a cocktail of different molds and bacteria. Id. at 113-116.

### 3.  Dr. Johanning Explained that No Studies Have Established Safe Levels of Indoor Mold Exposure

The absence of safe exposure standards do not negate the well accepted fact that indoor mold exposure is commonly associated with human injury, including inflammatory lung injury or HP Rider v Sandoz Pharma. Corp., 295 F.3d 1194, 1198 (11th Cir 2002); Heller v Shaw Indus. Inc., 167 F.3d 146, 154 (3d Cir. 1999). There are thousands of different types of mold. No scientific test can reasonably be done to test all the levels of the various combinations and circumstances of human indoor exposures. The American College of Government Industrial Hygienists [ACGIH], which publishes threshold limit values [TLV's] has noted that TLV's cannot be established for most bioaerosols. Molds and fungus produce bioaerosols. See ACGIH TLV Statement on Bioaerosols Exhibit 30.

Dr. Johanning, who has been involved with scientific research on the effects of indoor mold exposure on humans, explained that there are too many variable to determine mold exposure standards. Johanning Depo., Exhibit 14 at 50-51. These variables include genetic make up of different people, past medical history, circumstances of exposure, duration of exposure, intensity of exposure and the combination of the exposure. Id. at 50-51; Exhibit 30. People react differently to different exposures. Id. at 61. Ambiguity in exposure and individual reaction is expected. McClain, 2005 WL 477861, 5 n. 6 (11th Cir. 2005).

It is unusual to obtain extensive testing of an environment unless a person is part of a scientific study. Johanning Depo., Exhibit 14 at 60, 147, 150. However, based on the description

of the apartment environment and the bulk sampling obtained that confirmed the presence of mold in the apartment, Dr. Johanning has the opinion that Plaintiff was exposed to an unhealthy level of mold spores in her apartment. Id., 57, 72, 134-37, 143, 151. There is sufficient data for him to conclude, as an occupational environmental physician that Plaintiff was exposed to airborne exposure. Id. at 57, 72, 134-37, 144, 147, 151.

Exposure data that Dr. Johanning reviewed included the report of the industrial hygienist, Ken Warren. Id. at 72  Dr. Johanning did not rely on the report of Mr. Haney. Id. at 72. Kenneth Warren, a board-certified industrial hygienist, has explained that air testing is not reliable because the levels vary during the day. Exhibit 31, Warren Affidavit at Exhibit C

Kenneth Warren confirms that precise testing is not necessary to establish a hazardous mold environment. Exhibit 31. The state of the art relies on visible mold in an indoor environment is the best indication of the amount of indoor mold spore exposure. Id  The more visible mold that exists, the more exposure that can be expected. Id. Dr. Harbison's requirement for exact air testing is not generally accepted by either the medical or industrial hygiene professions

The recent McClain opinion may be relied upon by Defendant in its argument that a precise dose-response relationship is necessary to establish causation.  However, McClain addresses a unique issue of a toxic drug reaction. A toxic reaction is different from an allergic reaction. Allergic reactions are far more individualized.  There are no exposure level standards for allergic reactions. Exhibit 30  The physiological process by which a Type 3 reaction causes inflammation of the lungs is well known and generally accepted. Exhibits 23-29.

    **4.**    **Dr. Johanning Reached Opinions of Diagnosis, Prognosis and Causation of His Patient Based on Acceptable Medical Methodology**

### a.   Dr. Johanning Performed a Differential Diagnosis

#### i.   Johanning Described His General Methodology in His Clinical Practice

Dr. Johanning discussed the process of his differential diagnosis in great detail on several occasions during his thorough deposition.  Johanning Depo , Exhibit 14 at 102, 108, 141, 154  Dr. Johanning has a clinical practice. Johanning at 28.  In his clinical assessment as an occupational-environmental board certified clinician,  it is essential that he obtain the patient's historical data, medical facts, clinical facts and exposure history.  Id.  at 51-52  Dr. Johanning uses a differential diagnosis approach  Id.  at 52.

Historical facts are obtained from the patient.  Id.  Historical facts includes medical history, environmental history, occupational history.  Id.  at 52.  Medical history includes pre-existing conditions of the lungs, allergy, organ defects, cancer, infection, medications and family history.  Id. at 53.  Environmental history includes exposure data, including any other possible exposures, other than the one most suspected, that could cause the patient's symptoms.  Id. at 52.  Clinical data includes a physical examination, lab tests such as blood tests and urine tests, imaging studies such as MRI's and x-rays, function tests such as pulmonary function tests (PFT's) and tests obtained by other medical providers.  Id.  at 53.

Obtaining exposure history is a large part of Dr. Johanning's training as an occupational-environmental physician because it is so important in forming his diagnosis.  Id.  at 54.  Dr. Johanning also considers the general medical literature on the suspected exposure.  Id.  All of his published studies on mold injury have been peer-reviewed.  Id.  at 55.

#### ii.   Dr. Johanning Used The Same Differential Diagnostic Methods in Diagnosing Plaintiff As  He Uses in His Clinical Practice

Dr. Johanning used the same methodology in forming his diagnosis of Plaintiff as he uses in his clinical practice. Plaintiff completed a multi-page questionnaire that requested details of her personal, medical, family, occupational, environmental and exposure history which he reviewed. Johanning Depo., Exhibit 14 at 63-64. He also took five pages of notes on her history and his physical examination when he saw Plaintiff in his office on March 27, 2003 Id. at 75-77. The notes were read into the deposition record Id. at 77-82. The history included information on Plaintiff's symptoms, complaints, history of the complaints, past treatment for the complaints and medications. Id. at 78. Additionally, Dr. Johanning noted a review of symptoms, past medical history, family history, hobbies, work history, exposure history, and findings during his physical examination. Id. at 78-82. After Dr. Johanning's initial examination of Plaintiff, he noted the following working diagnoses: restrictive lung disease; alveolitis hypersensitivity pneumonitis [HP]; organic dust exposure; sinusitis chronic; rhinitis chronic; and allergy unspecified. Id at 73-74.

Dr. Johanning then determined appropriate testing based on her symptoms and history Id. at 83. The purpose of the ordered testing was to further his differential diagnostic approach. Id. at 83. Dr. Johanning tested Plaintiff's general immune competence and to determine if her symptomology could be explained by organ disease Id. He ordered a large number of tests, including blood tests, urinalysis, IgA, IgG, IgM and IgG subclass tests, interleukin test, thyroid tests, and lymphocyte tests. Id. at 83-84. He did not order allergy skin testing because those tests are not as helpful as blood testing since they are not as controlled. Id. at 108-09. Dr Johanning did not order a mycotoxin test of Plaintiff because she had been away from the exposure for many months when she came to see him. Id. at 58. Mycotoxins were not the primary problem because her lung

condition was most likely the result of an allergic reaction rather than a toxic reaction  Id. at 126-27, 131.

The testing ordered by Dr  Johanning did not find have any organ disease that would account for her symptoms. Also, Plaintiff was not immune compromised.  Id. at 87. However, Plaintiff did have an activated immune system and did have an IgG reaction to Thermoactinomyces, which is associated with exposure to mold and wet building environments in people who develop hypersensitivity pneumonitis with interstitial lung disease.  Id. at 89.

Additionally, he reviewed Plaintiff's abnormal PFT's and chest imaging studies.  Id. at 90. Dr. Johanning then ordered follow-up testing.  Id. at 91.  He determined the necessary follow-up testing based on the prior test results.  Id. The positive tests needed to be repeated  Id. at 92. The repeat tests showed that Plaintiff's Thermoactinomyces level was decreasing and that her immune system was still being stimulated.  Id. at 94-95.

The latest chest imaging studies showed improvement  The August, 2004 x-rays reported moderate scattered mild interstitial thickening.  Id. at 95.  The high resolution CT chest scan of November 18, 2004 reported that prior interstitial lung markings had cleared.  Id. Additionally, the PFT of October 13, 2004 that was reviewed by Dr  Johanning was essentially normal  Id. at 96.

Dr  Johanning also reviewed the prior laboratory findings, histories and symptoms reported by Plaintiff's other treating doctors.  Id. at 70, 72.  He reviewed the charts of Dr. Hodges, Dr Remler, Dr. Costanzo and Dr. Lieberman.  Id at  78, 138  Mold-induced HP was the best explanation.  Johanning Depo, Exhibit 14 at 73-74, 111-12

> **b.** **The Differential Diagnosis Considered Exposure, Temporality and Location**

Prior to moving into the apartment, Plaintiff did not have any significant medical history. Johanning Depo., Exhibit 14 at 101. Dr. Johanning obtained this information from the patient questionnaire and this was a part of his differential diagnosis. Id at 102. He was aware that she had been injured in a fire as a child but had not suffered any injury to her lungs. Id. Although Plaintiff had lived on a farm until she was age 7, she did not have agricultural exposure in moldy barns, an exposure that is often associated with HP. Id. at 103-04. Although she had lived in a tent after moving from her apartment, she had experienced her symptoms before moving to the tent Id. at 104. Plaintiff had both a temporal and location relationship between living in the apartment and her symptoms. Id. at 148.

All the clinical findings, the reported symptoms, the temporality and location of the symptoms, the test data including the blood tests, PFT's and chest imaging studies, the exposure data, and Plaintiff's type of injury with the clearing of the interstitial lung condition after avoidance of exposure, all support Dr. Johanning's differential diagnosis of Plaintiff's inflammatory lung condition caused by mold exposure in the apartment. Id. at 141, 154. No one test is adequate to make this differential diagnosis, but all the evidence, including the test data, fits the diagnosis of mold-induced Hypersensitivity Pneumonitis. Id. 74, 141, 154.

   c.   **In His Differential Diagnosis, Dr. Johanning Considered and Discounted Other Causes  Of Plaintiff's Documented Lung Injury**

Dr. Johanning considered many alternative causes of Plaintiff's lung injury, including allergy, organ disease, compromised immune system, collagen vascular disease, psychiatric, fungal infection, alcohol consumption, obesity and smoking induced COPD and idiopathic interstitial lung disease. Johanning Depo., Exhibit 14 at 119, 124-125,156.  The only competing diagnosis at this point is

smoking induced COPD from Dr. Costanzo.  Dr. Costanzo had not reviewed some of the testing ordered by Dr. Johanning and so her differential diagnosis is infirm. Costanzo Depo., Exhibit 18 at 78-81.

Dr. Johanning discounted smoking as a cause of Plaintiff's lung illness because she was relatively young, lung injury caused by smoking is irreversible, and COPD usually has an obstructive component in lung disease with chronic cough. Johanning Depo., Exhibit 14 at 102, 155.  Plaintiff's x-rays showed interstitial lung disease with ground glass opacities which is consistent with restrictive disease and not obstructive disease.  Id at 124.

Dr. Johanning discounted seasonal IgE allergies based on the blood test and temporality of her symptoms, which were not seasonal.  Id at 90, 108-09, 141  Additionally, he explained that negative findings on the allergy testing of the molds did not mean that Plaintiff had not had an allergic reaction to the molds while in the apartment  Id at 139.  Not everyone tests positive to the allergy tests although a positive test is a good indicator of exposure.  Id at 140.  For instance, Plaintiff tested slightly positive IgG to Thermoactinomyces long after her exposure.  Id  This is a good indicator of past exposure.  Id.  As time continued to pass from her exposure, her IgG levels continued to decrease, which would be consistent with avoidance of exposure  Id. at 89.

The negative IgE test to stachybotrys only meant that it was unlikely that Plaintiff was being actively exposed to stachybotrys at the time of the test, which was many months after Plaintiff had moved out of the apartment.  Id at 140. Usually, stachybotrys does not form allergens, since its spores are more of an irritant than an allergen. Id.  at 107.  If testing for IgE antibodies had been ordered when Plaintiff had first reported her symptoms at the emergency room, then the tests may

have been positive. Id. at 140. However, the emergency room is a purely clinical setting and such testing is not routinely performed. Id. 59-60.

Dr. Johanning considered collagen vascular disease and organ defects that were all discounted by testing  Id at 119, 156. He considered a psychiatric component but discounted it as a cause since Plaintiff did not have any psychiatric diagnosis, but did have confirmed pulmonary disease. Id at 78, 129. Other doctors also discounted other causes of Plaintiff's symptoms. Id at 156 Obesity is not an good explanation because she was not obese. Id. at 96, 125.  The statement suggesting obesity on the October 2004 PFT at Memorial Medical Center was computer generated Id. at 97.  Alcohol consumption was not a good explanation because there was no explanation for how it would have caused her lung condition. Id. at 125  Dr. Johanning agreed with Dr. Costanzo that Plaintiff did not have a fungal infection since there was no evidence of such an infection.  Id. at 123-24.

The best explanation for Plaintiff's constellation of symptoms and test results is a hypersensitivity reaction.  Id. at 131.  This is a permanent condition and she is at risk for similar reactions in the future. Id. at 132.  Plaintiff had a Type 3  IgG mediated allergic response. Id. at 127.

James Daly, M.D., a Savannah pulmonologist, has reviewed Dr. Johanning's deposition and records and believes that Dr. Johanning's differential diagnosis methodology was reliable.  Daly Affidavit, Exhibit 32

### CONCLUSION

A trial Court in Massachusetts which applied the Daubert analysis has allowed Dr. Johanning's testimony as a treating physician who performed a differential diagnosis.  Exhibit 33

In regards to whether Dr. Johanning was a specially retained expert, the only basis for Defendants' motion is the cost paid by Plaintiff for Dr. Johanning's time for preparation and consultation one month prior to his subpoenaed deposition. Plaintiff correctly expected that Defendant intended to aggressively depose Dr. Johanning and, then, attempt to exclude his testimony. His thorough, but expensive, preparation for his deposition was necessary. The rigorous scrutiny that this motion has placed on Dr. Johanning's diagnosis demonstrates the necessity for his thorough preparation. This cost did not change Johanning's status or the scope of his opinion. Cost is irrelevant.

Plaintiff respectfully requests that the Defendant's motion to exclude Dr. Johanning's testimony be denied.

This 14th day of March, 2005.

Eugene C. Brooks, IV
Georgia Bar No. 084750

Brooks Law Firm
313 West York Street
P.O. Box 9545
Savannah, GA 31412
912/233-9696

G USERS Active Personal Injury JAZAIRI CHRIS Response to Motion to Exclude Johanning wpd

CERTIFICATE OF SERVICE

This will certify that the undersigned today placed the attached pleading in the

United States Mail to all counsel of record as follows:

Attorneys for Mitchell Management d/b/a Royal Oaks
Stephen E. O'Day, Esq.
Andrew M. Thompson, Esq.
Smith, Gambrell & Russell, LLP
Suite 3100, Promenade II
1230 Peachtree St., N.E.
Atlanta GA 30309

This 14th day of March, 2005.

EUGENE C. BROOKS, IV
Attorney for Plaintiff
State Bar No 084750

BROOKS LAW FIRM
313 W. York Street
P.O. Box 9545
Savannah, GA 31412
912/233-9696