ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

CHRIS JAZAIRI,                          )
                                        )
                Plaintiff.              )
VS.                                     )        CIVIL ACTION
                                        )        FILE NO.: CV-04-404-091
ROYAL OAKS APARTMENT                    )
ASSOCIATES, L.P., Its Parent Company    )
 And Subsidiaries, And                  )
MITCHELL L. MORGAN                      )
MANAGEMENT, INC.,                       )
                Defendants.             )

## PLAINTIFF'S SECOND MOTION IN LIMINE
## RE: STUART BROOKS, M.D.

COMES NOW Plaintiff and moves to limit the testimony of Stuart Brooks, M.D., a named

expert for Defendant and states the following:

1.      Dr. Stuart Brooks has submitted an expert report which states that he will testify that

Plaintiff's pulmonary problems, if any, are related to smoking. See Exhibit 1 attached hereto at page

8. This testimony is the same opinion as Dr. Costanzo's, who has formed the opinion that Plaintiff's

pulmonary condition is related to smoking.  Costanzo Depo at 42, attached in pertinent part as

Exhibit 2.

2.      Dr. Brooks has formed his opinion based on review of medical records, including the

medical records generated by Dr. Costanzo.  Exhibit 1 at pp 3-6.  Dr. Brooks has not examined

Plaintiff, ordered any testing or performed a differential diagnosis of Plaintiff.  Dr. Brooks only

reiterates the opinion of Dr. Costanzo that Plaintiff has smoking-related pulmonary injury.

3.      The proffered testimony of Dr. Brooks concerning the Plaintiff's pulmonary injury

is cumulative and should be excluded.  Rule 403, F.R.E.  Additionally, the opinions of Dr. Brooks

are not reliable because Dr. Brooks has not used the same methodology as he regularly uses in his



medical practice.  Rules 702 and 703, F.R.E.  Dr. Brooks has not examined Plaintiff or performed a differential diagnosis.

4.      Dr. Brooks proffers an opinion in the last line of his report that Plaintiff's illness may include a "significant psychological component."  Exhibit 1 at 8.  This statement is not supported by any evidence.  Dr. Brooks does not refer to any psychological reports on Plaintiff.  He does not support his opinion with any methodology.  This opinion should be excluded.

5.      Dr. Brooks proffers an opinion on the evaluation of the apartment's environment. Exhibit 1 at 7.  He opines that the studies are "inadequate" and of "no value."  He also comments on the findings of the mold wipe as similar to outdoor concentrations.  Id.  These opinions are not based on any described methodology.  Furthermore, these opinions are outside of Dr. Brooks' area of expertise.  These conclusory statements must be excluded.

6.      Dr. Brooks refers to "numerous scientific reports." but does not list the reports that he refers to.  Exhibit 1 at 8.  Dr. Brooks simply states that "from these reports and many other scientific studies, it is my assessment..." Id.  Dr. Brooks fails to specify what he relied upon and so his methodology is a mystery.  Dr. Brooks' opinions based on these unnamed studies and reports must be excluded.  Id.

7.      Additionally, in the alternative, Dr. Brooks' testimony should be limited to the specific opinions and rationales that he sets forth in his expert report submitted pursuant to Rule 26(a)(2)(B), F.R.Civ.P. The report is required with the intention that the opposing party can rely on the report to determine if further discovery is necessary.  The expert report is required to "contain a complete statement of all opinions to be expressed and the basis and reasons therefore." Id.  The "reports may eliminate the need for a deposition." See Committee Notes 1993 Amendments ¶ (2).

WHEREFORE, Plaintiff respectfully requests that this motion be granted.


THIS, the 29 day of _April_, 2005.


_____
EUGENE C. BROOKS, IV
Georgia Bar No. 08-4750

Brooks Law Firm
313 West York Street
P.O. Box 9545
Savannah, GA  31412
912/233-9696


G \USERS\Active\Personal Injury JAZAIRI, CHRIS\2nd Motion in Limine - Brooks wpd

-3-

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

CHRIS JAZAIRI,                                    )
                                                  )
              Plaintiff.                          )
VS.                                               )       CIVIL ACTION
                                                  )       FILE NO.: CV-04-404-091
ROYAL OAKS APARTMENT                              )
ASSOCIATES, L.P., Its Parent Company              )
 And Subsidiaries, And                            )
MITCHELL L. MORGAN                                )
MANAGEMENT, INC.,                                 )
              Defendants.                          )

## BRIEF IN SUPPORT OF PLAINTIFF'S
## SECOND MOTION IN LIMINE
## RE: DR. STUART BROOKS

I.      **ARGUMENT AND CITATION OF AUTHORITY**

    A.      **Dr. Brooks Offers Cumulative Testimony**

    The federal rules of evidence recognize the trial Court's discretion to exclude cumulative and

repetitive testimony. Rule 403, F.R.E. In the case sub judice, Defendant's specially retained expert,

Dr. Stuart Brooks, has submitted an expert report that "most of her symptoms are probably related

to her long-term cigarette smoking ...". Exhibit 1 at 8.  In forming this opinion, Dr. Brooks have

reviewed Plaintiff's medical records, including the medical records of Dr. Costanzo.  Exhibit 1 at

3-6.  Dr. Brooks has not ever seen Plaintiff and has not performed a differential diagnosis on

Plaintiff.  His opinion is basically the same opinion as that formed by Dr. Costanzo who has also

testified that Plaintiff's pulmonary injury was caused by smoking.  Exhibit 2 at 42.

    The cumulative nature of Dr. Brooks testimony on the nature of Plaintiff's pulmonary injury

which is based on the same testing and examinations performed by Dr. Costanzo is repetitive and

would cause undue prejudice to Plaintiff. Rule 403, F.R.E. The jury may be confused as to whether Dr. Brooks treated Plaintiff or examined Plaintiff. Dr. Brooks' primary purpose appears to be corroboration of the Dr. Costanzo's opinion.

## B. The Federal Rules of Evidence Limit Expert Testimony Based on Lack of Reliability

Defendant has proffered the testimony of Dr. Brooks on a broad range of topics, including the nature of Plaintiff's pulmonary condition, her psychological condition, cause of her injury, environmental analysis of Plaintiff's apartment, the nature of the molds found in the apartment and the general state of medical literature on the topic of mold induced injury. Dr. Brooks's testimony should be limited because (1) he is not qualified to testify competently regarding certain matters he intends to address; (2) his proffered expert testimony is unreliable under Rule 702; (3) his proffered expert testimony is irrelevant under Rule 402; and (4) his proffered expert testimony is unfairly prejudicial under Rule 403.

The Federal Rules of Evidence provide for the admission of expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact." Fed. R. Evid. 702. Under Rule 702, in such situations a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify . . . in the form of an opinion or otherwise." Id.

The Supreme Court in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), focused on the admissibility of scientific expert testimony, finding that such testimony is admissible only if the expert is competent to present it, it is reliable and it is relevant. The Court explained that

"Federal Rule of Evidence 702 allows the admission of expert testimony only if: (1) the expert is competent and qualified to testify regarding the matters that he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the expert, through scientific, technical or specialized expertise, provides testimony that assists the trier of fact to understand the evidence or determine a fact in issue." Siharath v. Sandoz Pharm. Corp., 131 F. Supp. 2d 1347, 1351 (N.D. Ga. 2001) (citing Daubert, 509 U.S. at 590-91); Allison v. McGhan Med. Corp., 184 F.3d 1300, 1309 (11th Cir. 1999); City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562 (11th Cir. 1998)). To ensure that these elements are present, the Court held that, under Rule 702, trial judges are to serve as the "gatekeeper" to the introduction of such evidence. Daubert, 509 U.S. at 591-93. "The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in the factual determinations, its potential to create confusion, and its lack of probative value." Allison, 184 F.3d at 1311-12.

"The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Id. at 1306. "Where the burden has not been satisfied, Federal Rule of Evidence 702 precludes expert testimony." Siharath, 131 F. Supp. 2d at 1351.

In performing its "gatekeeping" function, the trial court is required, under Federal Rule of Evidence 104(a), to answer preliminary questions regarding the admissibility of expert testimony under Rule 702, examining the expert's opinion testimony for competence, reliability, and relevance. The first element addresses whether "the expert is qualified to testify competently regarding the matters he intends to address." Allison, 184 F.3d at 1306. Under Rule 702, the question is whether the witness is qualified as an expert "by knowledge, skill, experience, training or education" in the

-3-

area concerning which he or she will present expert testimony. Fed. R. Evid. 702. The court must examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994), cert. denied, 513 U.S. 1111 (1995).  If the witness is not qualified to testify competently regarding the matters he or she intends to address, then his or her testimony should be excluded. See United States v. Paul, 175 F.3d 906, 912 (11th Cir. 1999) (witness's review of literature in area outside his field "did not make him any more qualified to testify as an expert . . . than a lay person who read the same articles"); City of Tuscaloosa, 158 F.3d at 563 ("[P]ortions of [plaintiffs' expert's] testimony lie outside of his competence as a statistician . . ., thus requiring the exclusion of those portions of [his] data and testimony . . . .").

If the Court determines that the witness is qualified to testify competently regarding the matters he or she intends to address, the Court must next assess the reliability of the proffered expert testimony. The Court must determine "whether an expert's testimony reflects 'scientific knowledge,' whether the findings are 'derived by the scientific method,' and whether the work product amounts to 'good science.'" Daubert v. Merrell Dow Pharm., Inc., on remand, 43 F.3d 1311, 1316 (9th Cir. 1995), cert. denied, 516 U.S. 869 (1995) (quoting Daubert, 509 U.S. at 590, 593)). The adjective "scientific" in "scientific knowledge" implies "a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. Thus, "[u]nder the regime of Daubert . . . a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." Allison, 184 F.3d at 1316-17 (quoting Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996)). See also Cartwright

-4-

v. Home Depot U.S.A., Inc., 936 F. Supp. 900, 905 (M.D. Fla. 1996) ("Even experts must show that they used science and not speculation to come to their conclusions."). The burden of proving the reliability of proffered expert testimony rests with the person seeking to use it; "the expert's bald assurance of validity is not enough." Daubert, 43 F.3d at 1316.

## C.    Dr. Brooks' Testimony is Unreliable On Medical Issues

Dr. Brooks makes many unsupported statements in his expert report.  Most interesting is his statement in the final sentence of his report that states that Plaintiff may have a significant psychological component to her illness.  Exhibit 1 at 8.  Dr. Brooks offers no insight into how he reached this opinion.  He offers no reference to any psychological testing or any treatises or other texts that may illuminate us on how he reached his opinion.  Dr. Brooks' proffered opinion is inadmissible because it does not establish any methodology on how he reached his opinion.  Since Dr. Brooks has never met Plaintiff, has never tested Plaintiff and has never reviewed any psychological testing or other objective measure of Plaintiff's psychological health, there is no methodology that supports Dr. Brooks opinion.  Dr. Brooks subjective belief does not satisfy the standard for admission of expert testimony. Daubert, 509 U.S. at 590-91.

Additionally, Dr. Brooks has not performed a differential diagnosis on Plaintiff.  He has only reviewed medical records.  Dr. Brooks would not be expected to render diagnoses of patients he has never seen by simple review of medical records.  Mail order opinions are not an acceptable method of providing medical diagnoses.  Dr. Brooks opinions on Plaintiff's health fail to satisfy the

admissibility standards. Id.;   Westberry v Gummi, 178 F.3d 257, 263 (4th Cir., 1999)[differential diagnosis satisfies admissibility standard].

    **D.**    **Dr. Brooks's Is Not Qualified to Testify on Environmental Testing or the Nature of Molds**

Dr. Brooks has offered an opinion on the environmental evaluation of Plaintiff's apartment by the Chatham County Dept. of Health [CCDH], including the testing analysis obtained by the CCDH.   Exhibit 1 at 7.   Dr. Brooks does not have any expertise in the field of molds or environmental testing. He is a medical doctor with expertise in pulmonary medicine. He is not an industrial hygienist or a mycologist.  Dr. Brooks has no expertise to comment on the testing of the apartment or the nature of the molds found in the apartment. *See*  Paul, 175 F3d at 912; City of Tuscaloosa, 158 F3d at 563.

Furthermore, Dr. Brooks did not review any texts or other materials in forming his opinions of the evaluation of the apartment or the nature of the molds involved.  Exhibit 1 at 7. He simply states that the evaluation was inadequate and the molds were common to the outdoor air. Id.  Dr. Brooks has simply made conclusory statements without any support and that are not based on any methodology.  Therefore, this testimony should be excluded. Daubert, 509 U.S. at 590-591.

    **E.**    **Dr. Brooks' Opinion on Ability of Mold to Cause Injury Is Unsupported**

Dr. Brooks refers to unnamed sources as his references for his opinion that mold does not cause injury. Exhibit 1 at 8. Dr. Brooks' unsupported opinion fails to satisfy the methodology requirement. Daubert, 509 U.S. at 590-91. Dr. Brooks simply states that there are "numerous scientific reports" and that "from these reports and many other scientific studies" he has formed his opinion about whether mold exposure can cause injury. Exhibit 1 at 8. The expert report must disclose the support for Dr. Brooks' opinions. Rule 26 (a)(2)(B), F.R.Civ.P. Dr. Brooks' report fails to make this disclosure. Since no described methodology was followed by Dr. Brooks in reaching his opinion, the testimony must be excluded. Daubert, 509 U.S. at 590-91.

**F.  Dr. Brooks' Testimony Must Be Limited to Opinions and the Basis for Those Opinions in His Expert Report**

The federal rules require that a specially retained expert provide a full statement of his opinions and the basis and reasons therefrom, all materials that he relied upon in forming his opinions and all exhibits he will refer to in support of his opinions. Rule 26 (a)(2)(B), F.R.Civ.P. The committee that commented on the federal rules contemplated that the reports might eliminate the need for depositions. *See* Rule 26 F.R.E. Committee Notes, 1993 Amendments ¶ (2). Dr. Brooks has written an 8 page report and Plaintiff has relied on this report as a full statement of his opinions.

Dr. Brooks should not be allowed to extend his testimony beyond the opinions and rationales for those opinions that are stated in his expert report. Dr. Brooks testimony should be limited to the opinions that are properly supported and are not cumulative in his expert report. Rule 26(a)(2)(B) F.R. Civ. P.; Daubert, 509 U.S. at 590-91.

## CONCLUSION

An Order is attached for the Court's review.  Plaintiff respectfully requests that this order be entered which strictly limits Dr. Brooks's testimony only to matters in which he is qualified to opine, which are relevant to this case, and which have been properly disclosed.

This ___*Z9*___ day of April, 2005.

Eugene Q. Brooks, IV.
Georgia Bar No. 084750

Brooks Law Firm
313 West York Street
P.O. Box 9545
Savannah, GA  31412
912/233-9696

G:\USERS\Active\Personal Injury\JAZAIRI, CHRIS\Brief in Support of 2nd Motion in Limine - Brooks.wpd

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

CHRIS JAZAIRI,                              )
                                            )
                    Plaintiff.              )
VS.                                         )          CIVIL ACTION
                                            )          FILE NO.: CV-04-404-091
ROYAL OAKS APARTMENT                        )
ASSOCIATES, L.P., Its Parent Company        )
 And Subsidiaries, And                      )
MITCHELL L. MORGAN                          )
MANAGEMENT, INC.,                           )
                    Defendants.             )

**ORDER ON PLAINTIFF'S
SECOND MOTION IN LIMINE
RE: STUART BROOKS, M.D.**

Having read and considered Plaintiff's second motion in limine, it is hereby granted.  The

testimony of Dr. Stuart Brooks, a specially retained expert by Defendants, shall be limited as follows,

pursuant to the applicable rules of the Federal Rules of Evidence and the Federal Rules of Civil

Procedure:

Dr. Brooks's opinions on the pulmonary condition of Plaintiff is excluded because such

testimony would be cumulative of the testimony of Dr. Costanza; furthermore, Dr. Brooks opinions

about Plaintiff's psychological condition are excluded because they are unreliable and not based on

any described methodology; furthermore, Dr. Brooks is excluded from offering testimony on

Plaintiff's medical condition generally because he has not performed any medical examination of

Plaintiff, has not performed a differential diagnosis of Plaintiff and has not used a methodology in

forming his opinions that is commonly used by medical doctors in their regular and usual medical

practices; and

Furthermore, Dr. Brooks' statements and opinions on the environmental evaluation of the

Plaintiff's apartment and the molds identified in the apartment are excluded because these statements and opinions are unreliable because Dr. Brooks is not an expert in the field of environmental evaluation or molds; furthermore, Dr. Brooks statements and opinions based on unnamed scientific texts and reports are excluded because they are unreliable and the basis of his statements and opinions have not been properly produced in discovery; and

Furthermore, the testimony of Dr. Brooks is limited to the statements and opinions which he has described in his expert report of December 6, 2004.

So Ordered this _____ day of _____, 2005.


_____
Hon. B. Avant Edenfield
Judge, U.S. District Court
Southern District of Georgia, Savannah


G:\USERS\Active Personal Injury\JAZAIRI, CHRIS\Order - 2nd Motion in Limine - Brooks.wpd

December 6, 2004

Andrew M. Thompson
Smith, Gambrell & Russell, LLP
Suite 3100, Promenade 11
1230 Peachtree Street, NE
Atlanta, GA 30309-3592

## RE: CHRIS JAZAIRI v. ROYAL OAKS APARTMENT ASSOCIATES, et al

Dear Mr. Thompson,

I reviewed the medical records of Chris Jazairi versus Royal Oaks Apartment Associates et al. The various records include medical reports and results of laboratory tests, several photographs showing the interior of the apartment and surrounding areas, environmental measurements by the Health Department, a report by various physicians including Dr. Patricia Costanzo, a report of Doug Haney, the deposition of Chris Jazairi taken October 13, 2004, and other information.

## EXPOSURE HISTORY

Ms. Chris Jazairi alleges that she was exposed to "toxic molds" from May through September 2002 when she lived in a residence that was characterized as a "moisture/mold contaminated apartment"; there was alleged "continued exposure to the contaminated personal property" until October 2003. As a result of the exposure, Ms. Jazairi alleges that she developed an "injury to and dysfunction of multiple organs and systems", including the respiratory system.

According to hand written notes that I reviewed, a notation of May 4, 2002 indicates she moved to a Savannah Apartment, which were about 25 years old. The apartment had pest control; 2 dogs lived inside and there was an office in the apartment. Problems arose and she gave the landlord a list of these problems. Reportedly, there were 2 floors to the residence and leaking occurred from an upstairs' bathroom. There were also problems downstairs with the air ducts and the ventilation exhaust system. She reportedly noted symptoms of feeling exhausted and tired, dizziness, nausea, and "brain fog" in June 2002. According to the notes, there was

1

EXHIBIT

1

constant maintenance in the apartment over a 6 month period. Reportedly, painting was performed in areas where mold was found in both upstairs bathrooms, on wallpaper, and above the sink areas. The notes mention that mold was seen in the downstairs bathrooms, on wallpaper, and in the laundry room, as well as other areas. The notations indicate a cabinet in the bathroom was decomposing due to water damage.

In July 2002, her symptoms seemed to worsen; there was generalized pain involving mainly her arms and legs and there was aching of the bones. She noted stiffness and difficulty climbing stairs.  The dizziness and headache continued.  She also noted chest discomfort and claims she went to the emergency room where a physician informed her that she was suffering from "panic anxiety".  There were also complaints of fatigue, and weakness of unknown cause.  She called her father and complained about the maintenance problem and the water leaks. He suggested that the apartment be tested.

Eventually, various recommendations were made and in August of 2002 renovations were started. The upstairs area was renovated in order to correct the water leak.  During the renovation, allegedly a heavy growth of mold was noted behind the bathtub, in the walls, and in the insulation.  The renovations continued with dry walling and other changes.  A water line was broken when a repairman tore out the shower causing flooding of the apartment.    The notes claim there was standing water upstairs and downstairs and the carpets became flooded.

In February of 2003 she moved back to the farm and did not work. She still complained of illness; she woke up in the morning with muscle weakness, chest tightness, and difficulty breathing.   She eventually contacted Mold Relief Incorporated in Oklahoma.

In May 2003, while in Savannah, she moved into a furnished apartment that was sponsored by Mold Relief Incorporated where she stayed for 4 months. In July of 2003, Dr. Richard Lipsey tested the apartment for mold growth. In October of 2003 she moved into an apartment in Tybee Island, GA. The apartment apparently was 40 years old. There was pest control and dogs inside.  By December 2003 her symptoms had lessened.  She was treated for pneumonia with antibiotics in January of 2004.

## MEDICAL HISTORY

There are a number of medical records from Dr. Patricia Costanzo including her report of July 2004. By the time Ms. Jazairi saw Dr. Costanzo, she had many tests performed. In a report dated October 24, 2002, Dr. Costanzo relates that Ms. Jazairi was a 37-year-old cigarette smoker who presented with shortness of breath and an abnormal chest x-ray with symptoms starting in August 2002. At this time, Ms. Jazairi noted shortness of breath and left-sided chest pain and visited an emergency room where chest x-rays were reported to be slightly abnormal. There was worsening of her chest pain at the time of the examination. Dr. Costanzo's records mention a health department study that reportedly found the air quality in Ms. Jazairi's apartment to be unacceptable. She had moved into the apartment in May 2002; construction/renovations took place in July and August 2002; later she moved out of the apartment and into a hotel with a friend. Ms. Jazairi also reported symptoms of wheezing and coughing without mucus production. There was no history of hemoptysis or fever. A CT scan of the chest taken on October 2, 2002 showed "interstitial thickening with ground-glass opacities in the periphery of the lung fields". She averaged smoking one pack of cigarettes per day for 20 years.

She was born in the Ohio valley where she lived until age 18. She was adopted and there was no information on her parents. Dr. Costanzo's examination revealed normal vital signs and normal resting oxygen saturation. There were multiple skin telangiectasias on the base of her neck and anterior chest. Her chest was clear to auscultation and percussion.

There were subsequent visits to Dr. Costanzo over the next several months. She was treated with pain medication. At the end of 2002, she moved to Nebraska for a period of time.

Various testing was performed. Echocardiogram on February 26, 2003 was normal. A variety of blood tests in 2003 showed normal complete blood count and blood coagulability. Blood tests indicated past Epstein-Barr virus infection. An erythrocyte sedimentation rate and uric acid taken on August 3, 2002 were both slightly elevated. Pulmonary function tests on February 26, 2003 showed normal total lung capacity of 104% predicted and residual volume of 176% of predicted, suggesting air-trapping. FEV1/FVC ratio was normal. Pulmonary function tests performed on March 3, 2003 revealed spirometric forced vital capacity of 73% predicted. FEV1 was 82% predicted. FEV1/FVC was 88%. There was no significant response to

bronchodilator. Maximum voluntary ventilation was normal at 113% predicted. Lung volume measurements showed total lung capacity of 78% predicted and functional residual capacity of 77% predicted. There was markedly reduced expiratory reserve volume (ERV) of 56% predicted. Carbon monoxide diffusing capacity was normal when corrected for alveolar volume. There is also a report in July 2004 that discusses her medical condition.

There is a CT of the chest report dated 10/02/02, which shows interlobular septal thickening at the periphery of the right upper lobe, right middle lobe, and right lower lobe. There were a few areas of scattered ground-glass opacities in the right middle lobe and right lower lobe. This was nonspecific in nature. No bronchiectasis, septal thickening, or parenchymal bands were noted. There was no mediastinal adenopathy or pulmonary nodules. The interpretation was fine interstitial thickening with vague ground-glass opacities at the periphery of the lung fields that is nonspecific, but suggestive of an active process.

She had blood tests performed on August 5, 2004. A RAST battery measuring for specific IgE antibodies was negative for all of the allergens tested, including mouse urine protein, pigeon droppings, rat urine protein, various molds (e.g., *Aspergillus fumigatus*, *Chaetomium globosum*, *Cladosporium* and *Penicillium*) and cockroach. A hypersensitivity pneumonitis panel was negative for all the allergens tested except for a slightly raised level of specific immunoglobulin-G for *Thermoactinomyces* species. The *Stachybotrys* panel 2 was negative. Later on, there were more immunological testing including measurement of immunoglobulin-G subclasses (August 5, 2004), which were all within normal limits; this included IgG subclasses 1, 2, 3, and 4, as well as total IgG. Measurement of serum Tumor Necrosis Factor alpha and Interleukin-6 were normal. Quantitative blood lymphocyte analyses showed slightly elevated white blood cell count of 12,800, but normal percentage of total lymphocytes and normal total lymphocyte count. There was slightly increased absolute numbers of CD3 and CD4 lymphocytes. The CD4/CD8 ratio was slightly elevated. B-cell lymphocyte levels were normal.

She was seen by Dr. Costanzo again on February 19, 2003 for a follow-up visit. Examination of the chest was negative except for a few mild expiratory rhonchi. She apparently had been in Nebraska where she was feeling better and noted fewer symptoms. However, over the past two weeks after returning, she noted worsening of her symptoms. She reported

wheezing and shortness of breath, which did not respond as well to albuterol. There were prominent sinus symptoms. She continued to smoke a pack of cigarettes a day. It was mentioned that she had mild eosinophilia, but her immunoglobulin-E blood levels were normal. Dr. Costanzo discusses her medical condition in July 2004.

She underwent fiberoptic bronchoscopy on February 28, 2003. During bronchoscopy, her vocal cords appeared normal. The trachea and carina were mobile, but there appeared to be dilated and scattered mucus glands and increased prominence of mucosal corrugations, which was suggestive of chronic bronchitis (This might be expected with 20 years of cigarette smoking). The bronchial mucosa appeared inflamed and erythematous. The airways were washed and brushed; a few areas of mucosa appeared with whitish-appearing exudate and one of the areas was biopsied. Subsequently, the microscopic description interpreted "unremarkable" bronchial mucosa. The bronchial specimen cultures were negative. Aspirated secretions were placed under glass slides, stained with potassium hydroxide and found negative for mold and fungi were noted. Potassium hydroxide preparations staining of the bronchial brush tip revealed no yeast or hypha. Cultures were negative for tuberculosis and fungal species.

There was the Center for Occupational Environmental Medicine evaluation conducted by Dr. Alan Lieberman on April 12, 2004. Ms. Jazairi filled out a Symptom Response Sheet that was positive for many questions with responses claiming the symptoms were often present. The frequent symptoms included ear, nose, and throat symptoms, as well as dizziness, feeling faint, lightheadedness, bloodshot eyes, metallic taste in mouth, dry cough, and shortness of breath, asthma, wheezing, air hunger, chest tightness/sinusitis, and bronchitis. There was also mention of irregular/rapid heartbeat, pounding heart/palpitations, and high blood pressure. She described chest pain, nausea, vomiting and choking, indigestion, abdominal cramping and diarrhea, and bloating. There were also musculoskeletal complaints that occurred on a regular basis, including leg pains, muscle spasms, restless legs at night and various joint symptoms; there were complaints of weakness, fatigue, irritability, short-term memory loss, and cognitive problems. There was also skin rash with easy bruising, loss of appetite and hair loss.

There is a report by STL (Severn Trent) and P&K Microbiology Services Inc of samples collected from Ms. Jazairi's personal property on

July 2, 2003. The samples included bulk dust samples and wipe samples. The studies show that no air measurements were made, just the studies on the bulk and the wipe samples. These studies show growth of Penicillium and Stachybotrys as well as bacteria, but not in overwhelming/overload concentrations. Some of the samples also showed other fungi such as Fusarium and others. There is a letter dated September 20, 2002 from a Mr. Horner reporting on the analytical results from samples received on September 6, 2002. These were apparently bulk samples which grew out a variety of fungi, including Stachybotrys, Aspergillus, Cladosporium, Alternaria, and others.

I reviewed the defendants' interrogatory responses signed on July 30, 2004. I also reviewed the plaintiff's interrogatory responses and her complaint.

I reviewed the report by Douglas R Haney and a paper on indoor mold and mycotoxin exposure. I also reviewed the deposition of Chris Jazairi dated October 13, 2004.

## DISCUSSION AND COMMENT:

Ms. Jazairi claims multiple symptoms which she relates to an exposure that occurred during a several-month period in 2002 and persisted even though she moved out of the building (and for a period of time, out of the state). Ms. Jazairi reports that her symptoms are persistent in nature and continue to the present time. Symptom questionnaires document she completed disclose positive responses for symptoms involving just about every organ system.

A main focus was respiratory complaints. A chest x-ray and CT scan were said to be slightly abnormal. The CT scan was interpreted as showing mild interstitial lung disease. Pulmonary function studies, however, have been essentially normal except for possibly some reduced lung volumes (on one of the tests at some point in time, but later normal lung volumes). There has never been evidence of airflow obstruction, although one of the pulmonary function tests showed some air-trapping (increased residual volume). All of the allergy blood tests for mold were negative. Only one blood test showed slight increase in n igG level which only signifies past exposure and does not indicate disease or clinical symptomatology. Furthermore, her clinical picture is not consistent with a diagnosis of hypersensitivity pneumonitis.

6

She has been treated with medication that is used to treat asthma; however, her clinical picture is not consistent with a diagnosis of bronchial asthma. She shows no evidence of airflow obstruction. She does not show wheezing on physical examination of the chest. Pulmonary function tests conducted before and after an inhaled bronchodilator show no response to inhaled bronchodilator which is a characteristic feature of asthma. Therefore, in my opinion, she shows no evidence of asthma.

The abnormality noted on Ms. Jazairi's CT scan is relatively nonspecific and it is a type that can be seen in persons who are cigarette smokers. She is a cigarette smoker of a pack a day for 20 years. Her condition is characteristic of *Respiratory Bronchiolitis Interstitial Lung Disease (RB-ILD),* a disease characterized by the accumulation of pigmented macrophages within first- and second-order very small airways (e.g., respiratory bronchioles) (*Am J Respir Crit Care Med* Vol 165. pp 277–304, 2002). Just about 100% of patients with RB-ILD are cigarette smokers. Characteristically, patients with RB-ILD present with nonspecific respiratory complaints including gradual onset of dyspnea and the presence of a new or changed cough. It usually affects current smokers in the fourth and fifth decades of life with average exposures of more than 30 pack-years of cigarette smoking. In patients with minimal symptoms, pulmonary testing typically reveals a mild to moderate reduction in carbon monoxide transfer factor and occasionally there is an isolated increase in residual volume (as was described in Ms. Jazairi). The CT findings of RB-ILD include centrilobular nodules, patchy ground glass attenuation, and thickening of the walls of central and peripheral airways. Upper lobe centrilobular emphysema is common but not severe. Patchy areas of hypo-attenuation are thought to be due to air trapping. Similar findings are seen in many asymptomatic smokers, but the findings in patients with RB-ILD are usually more extensive. The CT findings of RB-ILD may be reversible in some patients who stop smoking and/or are treated with corticosteroids.

There were studies conducted on the apartment, but in my opinion, these studies are inadequate and are of no value in assessing the apartment exposure. No actual air sampling measurements were conducted to determine airborne concentrations. The type of mold present on the wipe and bulk samples reflect similar to the type of molds found outdoors. In most cases, the measured concentrations of mold outdoors are several times higher than mold levels indoors. Ms. Jazairi's clinical picture is not consistent with any mold-related illness. She does not show convincing

7

clinical evidence of asthma or allergic manifestations.    Her symptoms continue even though there is cessation of exposure and she reports a whole vast array of symptoms that are not biologically plausible for a relationship to mold exposure. She shows no evidence of immunological intolerance or dysfunction. All of her immunological studies were normal.

There are numerous scientific reports dealing with the health effects of indoor molds, including the reports by the American College of Occupational and Environmental Medicine (ACOEM), the American College of Allergy and Clinical Immunology, and the Institute of Medicine (2000 and 2004). From these reports and many other scientific studies, it is my assessment that there is no serious chronic respiratory condition caused by mold exposure in residential and non-residential buildings. Mold growth indoors is a dynamic process and changes with time; mold growth is influenced by alterations in the indoor environment and food sources. Therefore, indoor levels are never always the same on repeated measurements. Often there is no logical explanation of a logical exposure pathway. The public perception that molds are "toxic" to humans, under conditions of poor indoor air quality situations is not founded on scientific facts.

## CONCLUSIONS

In summary, it is my opinion that Ms. Chris Jazairi shows no evidence of illnesses caused by building-related factors.  She reports a number of complaints that I cannot ascribe to past indoor exposures. Her symptoms are generalized and multiple, and are not consistent with any known medical condition.    I find no evidence to suggest that she has any significant pulmonary disease and that most of her symptoms are probably related to her long-term cigarette smoking and additionally, there may be a significant psychological component to her illness.

Sincerely,

Stuart Brooks, MD

8

CHRIS JAZAIRI v.
ROYAL OAKS APARTMENT, et al.

PATRICIA COSTANZO, M.
November 22, 200

[1] to that?
[2]    A.   Because she just kept directing the
[3] conversation back to the fact that she thought all of
[4] her symptoms were due to exposure to fungus and molds
[5] and didn't want to hear what I was -- she seemed not
[6] to want to hear what I had to say, and I tried to
[7] convince her that she could be better if she would
[8] take medication and stop -- continue to not smoke.
[9]    Q.   Over the almost two years that you saw and
[10] treated Ms. Jazairi, had you considered mold exposure
[11] as a potential cause of her symptoms?
[12]    A.   Yes.
[13]    Q.   And what had you concluded in regard to
[14] that?
[15]    A.   Well, I think that when I first saw her,
[16] it's possible that she could have had a problem from
[17] the mold. It's possible.
[18]        But having moved out of the environment
[19] and as time passed, it didn't appear to be so, at
[20] least as far as I could tell.
[21]    Q.   If I could have you take a look back at
[22] Exhibit 65, Impression Number 1, if you could just
[23] read that into the record for me.
[24]    A.   What is it that you want me to read?
[25]    Q.   The impression discussion, Number 1.

[1]    A.   On July 20th?
[2]        MR. THOMPSON: Yes.
[3]        MR. BROOKS: Objection to form.
[4]        THE WITNESS: "Impression, Number 1, I see
[5] no reason to blame any other disease process
[6] other than asthmatic bronchitis due to cigarette
[7] smoking for the chest symptoms in the patient.
[8] I do not understand why she is focusing so much
[9] on this fungal exposure. I cannot imagine what
[10] fungal disease would linger and cause all of the
[11] symptoms she is complaining of. It is not clear
[12] that she ever had interstitial lung disease,
[13] although initially her chest x-ray was
[14] suggestive of it. And, two, tobacco addiction."
[15]        Now, when I write my impression, I'm
[16] generally dealing just with the pulmonary issues
[17] here. I'm not going over any other things that
[18] she had.
[19]    Q.   (By Mr. Thompson) And was that what you
[20] just read, was that your impression as of July 20th,
[21] 2004?
[22]    A.   It was.
[23]        MR. BROOKS: Object to the form.
[24]    Q.   (By Mr. Thompson) And have you reached
[25] that opinion based on a reasonable degree of medical

[1] certainty?
[2]    A.   Yes.
[3]    Q.   And if you could just describe for me
[4] generally how you reached that opinion.
[5]    A.   She was wheezing, coughing. She had
[6] mucus. Her chest x-ray had gotten better. There was
[7] no indication on the pulmonary function test of an
[8] interstitial lung problem, which is usually
[9] manifested with low lung volumes and sometimes
[10] diffusion abnormalities.
[11]        It all fits. This is what I see -- 80
[12] percent of what I see in my practice is asthmatic
[13] bronchitis, and I see it over and over and over
[14] again.
[15]    Q.   And you've been practicing close to 25
[16] years?
[17]    A.   Correct.
[18]    Q.   You also note tobacco addiction. What did
[19] you mean by that?
[20]    A.   She had only been off cigarettes -- what
[21] she told me in the history is that she had only been
[22] off cigarettes for a short time and she was using a
[23] Nicotrol inhaler.
[24]        So certainly there's always a chance that
[25] someone will go back to cigarettes and I wouldn't

[1] have considered the addiction gone. It's too soon.
[2]    Q.   And you also after your impression
[3] discussion you have a plan of management. What does
[4] that mean?
[5]    A.   It was my suggestion for that day, that
[6] visit.
[7]    Q.   What was your first suggestion?
[8]    A.   Continued encouragement in regard to
[9] smoking cessation.
[10]    Q.   And did you provide that guidance to
[11] Ms. Jazairi?
[12]    A.   Yes.
[13]    Q.   Then what was your second plan of
[14] management?
[15]    A.   "Treat symptoms by starting Spiriva and
[16] Advair. I have sincere doubts whether she is going
[17] to take this medication because I believe she wants
[18] to continue having symptoms to try to make a case for
[19] this fungal infection."
[20]        MR. BROOKS: Objection, relevance.
[21]    Q.   (By Mr. Thompson) And did you -- what did
[22] you mean by that?
[23]    A.   Because she kept trying to direct all of
[24] her symptoms back to the fungus and she seemed to be
[25] almost unhappy when I suggeste

**EXHIBIT**

2

CERTIFICATE OF SERVICE

This will certify that the undersigned today placed the attached discovery in the

United States Mail to all counsel of record as follows:


Attorneys for Mitchell Management d/b/a Royal Oaks

Andrew M. Thompson, Esq.
Stephen E. O'Day, Esq.
Smith, Gambrell & Russell, LLP
Suite 3100, Promenade II
1230 Peachtree St., N.E.
Atlanta GA 30309

This _78_ day of ___April___, 2005.

EUGENE C. BROOKS, IV
Attorney for Plaintiff
State Bar No: 084750

BROOKS LAW FIRM
313 W. York Street
P.O. Box 9545
Savannah, GA  31412
912/233-9696