UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

CHRIS JAZAIRI,

    Plaintiff,

v.             404CV091

ROYAL OAKS APARTMENT ASSOCIATES, L.P., its Parent Company and Subsidiaries, and MITCHELL L. MORGAN MANAGEMENT, INC.,

    Defendants.

## ORDER

### I. INTRODUCTION

In this premises liability/mold exposure case, plaintiff Chris Jazairi sues defendants Royal Oaks Apartment Associates, L.P., its parent company and subsidiaries, and Mitchell L. Morgan Management, Inc. (collectively, "Royal Oaks"), for damages arising from her exposure to mold in a Royal Oaks apartment in Savannah, Georgia. Doc. # 1. Defendants move to exclude causation testimony from plaintiff's expert, Dr. Eckardt Johanning, and for summary judgment. Doc. ## 36, 46. Jazairi opposes those motions and moves to exclude testimony from Royal Oaks' experts, Dr. Stuart Brooks and Raymond Harbison, Ph.D. Doc. ## 81, 82.

### II. BACKGROUND

Jazairi moved into a Royal Oaks apartment in May 2002 with her then-fiancé, David Potter. Doc. # 69 exh. 37 at 36. After living in the apartment for a short time, they noticed mold in the bathrooms, around the air conditioning ducts, in the kitchen, on the laundry room ceiling, and in the HVAC closet. Doc. # 63 exh. 13 at 32-36, 128; doc. # 69 exh. 34 ¶ 8. They attempted to scrub mold off the kitchen wall, but were unsuccessful. Doc. # 63 exh. 13 at 36.

Two months later they contacted the Chatham County Department of Heath (CCDH) about the mold problem. *Id.* at 126. Sharon Varn, a CCDH Environmental Heath Specialist, inspected the apartment on 7/29/02. Doc. # 69 exh. 34 at 2. She found visible mold in sufficient quantities to indicate long-term water intrusion. *Id.* She took two dry bulk samples, placed each into a dry, sterile plastic bag, and had them analyzed a month later. *Id.* at 3. Analysis of the bulk samples would later reveal the presence of Stachybotrys chartarum, Aspergillus, Aureobasidium, Cladosprium, and Alternaria.[1] Doc. # 50 exh. FF.

Based on her visual inspection of the apartment, Varn recommended that it be remediated and provided the apartment managers with a copy of the EPA remediation guidelines. *Id.* Between 7/29/02 and 8/3/02, Royal Oaks thus repaired water leaks, cut out walls and ceilings, and replaced cabinets in an attempt to remove the mold.[2] Doc. # 69 exh. 41,

---

[1] The capitalized names reflect only the genus of the mold present. Species of Aspergillus included niveus, puniceus, and versicolor. Doc. # 50 exh. FF. No chemical analysis was performed to determine which species of the other molds were present. Doc. # 41 at 43. No air samples were taken inside or outside the apartment to determine the quantity or type of airborne mold spores. Doc. # 41 at 113.

[2] Jazairi apparently remained in the apartment during some portion of the remediation, but was eventually moved to a hotel from 8/2/02 to 8/5/02. *Compare* doc. # 69 exh. 38 at 45, 77-78 (indicating that they where first out of town and then in a hotel during remediation) *with* doc. # 69 exh. 41 (report indicating that plaintiff's dogs were present when work was being done and plaintiff was at the pool at one point) *and* doc. # 63 exh. 4 at 135-37 (Jazairi claims that she was present in the apartment during some of the remediation). After the remediation Jazairi spent a lot of time out of the apartment to avoid additional

exh. 38 at 80. Jazairi alleges that they did not follow the EPA remediation guidelines. Doc. # 63 exh. 13 at 141.

On 10/1/02 Jazairi and Potter moved out of the Royal Oaks apartment and began living in a tent on their undeveloped property in Tattnall County, Georgia. Doc. # 63 exh. 4 at 41-42, 199. Jazairi stored her personal property in another tent on that land. *Id.* exh. 4 at 150. She lived there for a month or two before moving into another Savannah apartment. *Id.* exh. 4 at 42.

Meanwhile, Jazairi went to a hospital emergency room on 8/3/02 complaining of memory loss, fatigue, and malaise[3] as a result of her "exposure to toxic mold." Doc. # 63 exh. 1. She reported no chest pain, coughing, or wheezing at this time. *Id.* She had her chest X-rayed on 8/19/02, revealing interstitial thickening bilaterally in her lungs. Doc. # 63 exh. 2.

One month later she saw Dr. Robert Remler, a general practitioner who indicated that the chest X-ray revealed possible interstitial fibrosis.[4] *Id.* exh. 3. Jazairi's chest was again X-rayed on that date revealing "a generalized prominence of the interstitial markings throughout both lung fields with no particular upper or lower zone predominance." *Id.* exh. 5.

Dr. Remler ordered a high resolution Computed Tomography scan (CT or CAT scan) of her chest and noted that she may need pulmonary (lung) and allergy evaluation. *Id.* Jazairi's CT scan confirmed that she had some pulmonary fibrosis (interstitial thickening with vague ground glass opacities) indicative of interstitial lung disease,[5] cause unknown. *Id.* exh. 6. Dr. Remler thus referred her to Dr. Patricia Costanzo, a lung specialist. *Id.*

During her 10/24/02 visit with Dr. Costanzo, Jazairi first reported symptoms of coughing, wheezing, chest pains, and shortness of breath. Doc. # 40 exh. 72. Dr. Constanzo noted that Jazairi had smoked one pack of cigarettes per day for twenty years, that she lived with a smoker, and that she consumes four ounces of alcohol per day. *Id.* exh. 7; doc. # 40 exh. 65.

She also noted that Jazairi reported no history of seasonal or perennial allergies. Doc. # 40 exh. 72. Dr. Costanzo analyzed two Pulmonary Function Tests (PFTs)[6] which indicated mild abnormalities in Jazairi's lungs. Doc. # 40 at

---

exposure. Doc. # 63 exh. 13 at 127, 136.

[3] Malaise is "an indefinite feeling of debility or lack of health often indicative of or accompanying the onset of an illness." *See Merriam-Webster Online Dictionary at* www.m-w.com.

[4] Interstitial fibrosis refers to scarring of lung tissue between the air sacs. *See* American Lung Association, *Interstitial Lung Disease*, at www.cheshire-med.com/programs/pulrehab/ipf.html (site as of 6/23/05).

[5] Interstitial lung disease is a general term that includes more than 130 chronic lung disorders. *See* American lung association, *at* www.cheshire-med.com/programs/pulrehab/ipf.html (site as of 6/23/05). The term "ground glass opacities" refers to haziness detected, usually in CT scans, in the alveoli (tiny sacs at the end of the bronchial tubes where oxygen from the air exchanges with carbon dioxide in the blood). Doc. # 63 exh. 18 at 58-59. The haziness is indicative of an active, nonspecific problem in the alveoli. *Id.*

[6] PFTs measure lung volumes, the ability to push air out of the lungs (spirometry), to ventilate in and out, and the ability of the lungs to perform gas exchange (oxygen and carbon dioxide). Doc. # 40 at 11. The test requires patients to take a deep breath and blow as hard as they can. Doc. # 41 at 101. At least one doctor (her own expert in this case) questioned Jazairi's effort and was concerned that she might be "throwing" the test. *Id.* at 100-01.

13-14, exh. 58, 59. The results indicated the presence of an obstructive or restrictive lung disease,[7] or an infection. *Id.* at 74, 88. She noted potential diagnoses of chronic hypersensitivity pneumonitis, sarcoidosis, eosinophilic granuloma, lung disease associated with dermatomyositis, or collagen vascular disease/vasculitis. Doc. # 40 exh. 72 at 2. She also noted a remote possibility of malignancy with lymphangitic spread. *Id.* Finally, she included Wegener and interstitial pneumonia, such as nonspecific respiratory bronchiolitis, as potential causes. *Id.* Dr. Costanzo would later note that Jazairi could have had a potential infection, viral pneumonia, or obesity effect impacting her PFTs and X-rays. *Id.* at 86, 88.

In February 2003 Jazairi reported to Dr. Costanzo that she had been more sick recently with shortness of breath and wheezing. Doc. # 40 exh. 75. Dr. Costanzo noted that her 2/19/03 chest X-rays appeared somewhat improved. *Id.* She noted that it was possible that Jazairi has or had a lung disease caused by fungal exposure, but that Jazairi's symptoms were more likely related to asthmatic bronchitis. *Id.* Dr. Costanzo thus prescribed Advair, which contains both a bronchodilator to relax the musculature of the airways to allow more air flow, and a steroid to reduce inflamation and mucous production. Doc. # 40 at 28-29 & exh. 75.

Dr. Costanzo then performed a fiberoptic bronchoscopy on Jazairi to determine if she had fungal growth in her lung. She discovered none. *Id.* at 21-24; doc. # 50 exh. M, N. However, that testing did not rule out hypersensitive pneumonitis, which could be cause by inhaled mold spores *without* producing fungal growth in the lungs. Doc. # 40 at 25-26. The bronchoscopy revealed "dilated mucous glands scattered and increased prominence of the mucosal corrugations. This finding is suggestive of chronic bronchitis" caused by cigarette smoking. Doc. # 50 exh. M; doc. # 40 at 22. Jazairi's February PFT showed that her lung volume and diffusion (gas exchange) had both improved. Doc. # 40 exh. 76.

Instead of fulfilling Dr. Costanzo's prescription, Jazairi decided to change doctors. *Id.* at 30-31; doc. # 41 at 79. After moving out of town and visiting several other doctors, she returned one year later to see Dr. Costanzo on 7/20/04. Doc. # 40 exh. 65. At that time Jazairi reported that she had stopped smoking but continued to have shortness of breath, wheezing, and congestion. *Id.* She also reported a slew of other symptoms, covering every portion of her body, each of which she attributed to mold exposure. *Id.*

Dr. Costanzo concluded that Jazairi's lung condition and chest symptoms were caused by asthmatic bronchitis from cigarette smoking. *Id.* at 40-43; doc. # 63 exh. O at 2. She noted that

> I see no reason to blame any other disease process, other than asthmatic bronchitis due to cigarette smoking, for the chest symptoms in this patient. I do not understand why she is focusing so much on this fungal exposure. I cannot imagine what fungal disease would linger and cause all the symptoms that she is complaining of. It is not clear that she ever had interstitial lung disease, although initially her chest x-ray was suggestive of it.

---

[7] Obstructive lung diseases (like asthma, asthmatic bronchitis, and emphysema) reduce the ability to exhale air, and airflow is prolonged in order to empty the lungs. In extreme cases air remains trapped in the lung. Doc. # 40 at 47-48. Restrictive lung diseases (like hypersensitivity pneumonitis) cause the lungs to stiffen, thus reducing air intake (i.e., reduced lung capacity). *Id.*

3

Doc. # 40 exh. 65 at 2. Dr. Costanzo also stated that Jazairi

> was wheezing, coughing. She had mucus. Her chest x-ray had gotten better. There was no indication on the pulmonary function test of an interstitial lung problem, which is usually manifested with low lung volumes and sometimes diffusion abnormalities. It all fits. This is what I see -- 80 percent of what I see in my practice is asthmatic bronchitis, and I see it over and over and over again.

*Id.* at 43. Dr. Costanzo thus prescribed Advair, Spiriva (another bronchodilator), and a Nicotrol inhaler to help her quit smoking. Doc. # 40 at 27.

Dr. Costanzo also reported that "[s]he just seemed to not believe she had anything other than the fungus infection ... she was sort of tunnel vision on that matter." Doc. # 40 at 30, 44, exh. 65 (Dr. Constanzo's medical notes state: "I believe she wants to continue having symptoms to try to make a case for this fungal infection ... I am not sure if she wants me to help her and treat her or whether she simply wants me to try to help her with her lawsuit").

Meanwhile, in February 2003 Jazairi's fiancé discovered Dr. Eckardt Johanning on the internet. Doc. # 62 at 2. Dr. Johanning is a physician, board-certified in environmental and occupational medicine in Albany, New York. Doc. # 41 at 22. After filling out a questionnaire over the Internet, Jazairi drove to Albany to see Dr. Johanning. Doc. # 43 at 45. She again reported a battery of symptoms. Doc. # 41 at 80, 117. He performed a physical exam, reviewed her past medical records, and suggested that blood tests be done.[8] Doc. # 41 at 82-83. Jazairi made one other trip to see Dr. Johanning in November 2004.[9] Doc. # 41 at 110-11.

Dr. Johanning ordered IgE allergy testing to detect allergies from dust, dust mites, mice, pigeons, cockroaches, and rats. Results were negative. Doc. # 41 at 106, 108. No test was performed to determine if Jazairi has allergies to dogs (she has two), or to any other allergens that might be found in her area of residence, such as pollens, grasses, or trees. *Id.* at 107-08; doc. # 44 at 55. He tested her sensitivity to molds in the following genera: Aspergillus, Chaetomium, Cladosporium, Penicillium, Alternaria, Aureobasidium, Trichoderma, and Thermoactinomyces (a bacteria). Doc. # 41 at 109, 88. He also tested for sensitivity to the specific mold species, Aspergillus fumigatus, Penicillium notatum, and Phoma herbarum. *Id.* at 109. Jazairi tested negative to each mold; however, she tested positive to bacteria in the Thermoactinomyces genus. *Id.* at 109, 88.

Jazairi returned to see Dr. Johanning a year and a half later. At that time he had repeat tests performed with similar results. *Id.* at 90-94. The later tests did reveal, however, that Jazairi's response to Thermoactinomyces had diminished. Doc. # 41 at 141. CT scans at that time also revealed that the prior interstitial lung markings had cleared. *Id.* at 95. He then diagnosed her with a *resolved or resolving* allergic inflammatory lung condition[10] and concluded

---

[8] Dr. Johanning tested for allergies to "things that people typically have when they have moisture related problems." Doc. # 41 at 107-08.

[9] Meanwhile, Jazairi had initiated this lawsuit on 4/30/04. Doc. # 1 (attached Complaint).

[10] Jazairi testifies that none of her symptoms have gotten better, doc. # 44 at 39-40, and she continues to report

4

that it had been caused by inhalation of both mold and bacteria spores contained in her Royal Oaks apartment.[11] Doc. # 41 at 96, 112, 115, 119, 130-32, 142, 154.

He also concluded that her headaches and chronic fatigue were potentially symptoms of her mold-induced illness. Doc. # 41 at 117, 118. While Jazairi continues to report a number of other problems, including diarrhea, joint pain, sleeping problems, confusion, memory loss, balance problems, irregular periods, difficulty swallowing, sound sensitivity, irritability, occasional panic attacks, blurred vision, and heart burn, he could not correlate those symptoms to her mold exposure.[12] *Id.* at 117, 80.

Dr. Johanning's conclusion was based on the differential diagnosis[13] performed by other doctors in combination with his own differential method. *Id.* at 119, 156. Essentially Dr. Johanning appears to have relied on the differential diagnoses of other doctors to rule out nearly every potential cause, but then differentiated them (*e.g.*, Dr. Costanzo's diagnosis) by ruling out smoking-induced asthmatic bronchitis.[14] *Id.* at 120-25. He suggests that Jazairi is too young to have long-term smoking effects; that smoking effects are *usually* irreversible, whereas Jazairi's lung condition has resolved; and that the X-ray findings are more consistent with an allergic lung problem than asthmatic bronchitis (in smoking-induced asthmatic bronchitis, one does not usually see interstitial X-ray abnormalities or ground glass opacities on X-rays).[15] *Id.* at 120-25, 141, 155. He also relies on the fact that Dr. Costanzo had not seen the blood test revealing antibodies to Thermoactinomyces, which suggests exposure to bacteria. *Id.*

## III. ANALYSIS

### A. Expert Report Requirement

F.R.Civ.P. 26(a)(2)(A) requires parties to disclose the identity of any expert who may be used at trial. Rule 26(a)(2)(B) then imposes specific disclosure requirements upon any witness "who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony." Those expert witnesses must provide a written report

---

difficulty breathing and chest pains. *Id.* at 29, 55-56.

[11] Dr. Johanning suggested that Jazairi's condition may be permanent and irreversible in the sense that she may be hypersensitive in the future to whatever mold or bacteria caused this problem. Doc. # 41 at 128, 131-32. He testifies that at this point it is too early to tell, and most people fully recover when they move away from the allergen source. *Id.* Even if she has a permanent hypersensitivity, if she avoids re-exposure, then she should have no problems. *Id.*

[12] Dr. Johanning suggests that alcohol consumption or a psychiatric condition may contribute to her remaining symptoms. Doc. # 41 at 116-17, 126, 130.

[13] Differential diagnosis involves "[t]he determination of which two or more diseases with similar symptoms is the one from which a patient is suffering from based on an analysis of the clinical data." CancerWEB's Online Medical Dictionary, *at* http://cancerweb.ncl.ac.uk/omd.

[14] When asked whether there are other potential causes for Jazairi's lung condition, Dr. Johanning responded, "Well, there could be others I mean they were listed by some of the pulmonary doctors at time but none of these other differential diagnosis showed up in any form or another." Doc. # 41 at 119.

[15] The Court accepts the handwritten corrections contained in plaintiff's minuscript version of Dr. Johanning's deposition. Doc. # 63 exh. 14 at 124. If the defendants object, they may file a rule 59(e) motion for reconsideration, at which time the Court will determine precisely what Dr. Johanning said in his deposition.

containing "a complete statement of all opinions to be expressed and the basis and reasons therefor," as well as data and information relied on by the expert, exhibits to be used, his qualifications, the compensation to be paid for the testimony, and a list of all other cases in which he has testified as an expert within the preceding four years. *Id.*

Any party who "without substantial justification" fails to disclose this information is not permitted to use the witness as evidence at trial "unless such failure is harmless." F.R.Civ.P. 37(c)(1). The Court may impose other appropriate sanctions in addition to or in lieu of the evidentiary exclusion. *Id.*; *Prieto v. Malgor*, 361 F.3d 1313, 1317-18 (11th Cir. 2004).

The commentary to Rule 26 distinguishes between retained experts and witnesses providing expert testimony because of their involvement in the facts of a case: a "treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report." Rule 26, cmt. 1993 Amendments, subdivision (a)¶(2).

Defendants move to exclude Dr. Johanning's testimony because, although he was properly identified as an expert witness and his medical records were available for discovery, no expert report was provided.[16] Doc. # 47 at 4. They point out that Jazairi paid Dr. Johanning his "standard retainer fee" of $3,000, so he should be considered a "retained" expert witness under Rule 26. *Id.* Defendants also argue that in substance Dr. Johanning testifies as to the cause of Jazairi's injuries more than to diagnosis and treatment of her injuries. *Id.* at 4-6. In fact, they suggest that he has prescribed no treatment at all. *Id.* They also note that Jazairi had contacted attorneys before seeing Dr. Johanning; that he lives far away from plaintiff; and that she has only seen him on two occasions, over 1.5 years apart. *Id.*

Plaintiff responds that she sought Dr. Johanning's opinion because of his specialty in dealing with mold-related illnesses. Doc. # 62 at 5. She paid for his services on both visits and considers him her primary treating physician. *Id.* While he has not prescribed any medicines for Jazairi, that is because the primary treatment for mold-induced hypersensitivity pneumonitis (HP) is avoidance of the offending molds. *Id.*

As for Dr. Johanning's retainer fee, Jazairi claims that it merely compensates him for thoroughly reviewing her medical records in anticipation of a searching deposition, then reviewing them with her attorney. *Id.* at 6. In any event, plaintiff argues that an expert report is only required of a treating physician when his testimony extends beyond that which is usually contemplated during treatments. Diagnosis, prognosis, and causation opinions, she insists, are all developed during this type of treatment. Doc. # 62 at 4-5.

A treating physician is exempt from Rule 26(a)(2)(B)'s reporting requirements to the extent his opinions are "related to information disclosed during the care and treatment of plaintiff." *Brown v. Best Foods, A Division of CPC Intern., Inc.*, 169 F.R.D. 385, 389 (N.D.Ala. 1996). For example, a treating physician who reviewed another doctor's medical records in order to opine on the

---

[16] In her successful motion to Extend Time to Name Expert Witnesses, Jazairi identified Dr. Johanning as an expert witness, but also explained that he was a treating physician since he had examined Jazairi prior to her filing of this case. Doc. # 17 at 2. At that time she indicated that his medical records on her were available for discovery. *Id.*

appropriateness of the treatment provided would be "retained" within the meaning of Rule 26(a)(2)(B) notwithstanding that he also happens to be the treating physician. *Wreath v. United States*, 161 F.R.D. 448, 450 (D.Kan. 1995); *Patel v. Gayes*, 984 F.2d 214, 218 (7th Cir. 1993) (same).

Conversely, if a treating physician must determine the cause of his patient's injury in order to treat her, then the physician's testimony on that issue is permissible as lay testimony. *U.S. v. Henderson*, ___ F.3d ___, 2005 WL 1208311 at *5 (11th Cir. 5/23/05) (only when considering hypothetical questions is the physician treated as an expert witness).

Defendants essentially suggest that Dr. Johanning is not a treating physician at all, but rather an expert employed only to create causation testimony for Jazairi's case. Doc. # 47 at 4-6. That contention is difficult to resolve. While Dr. Johanning does not live near plaintiff, it is not unusual for sick patients to seek out doctors far away who have particular expertise with an unusual illness. Jazairi also admits that she had spoken with a lawyer prior to seeing Dr. Johanning; however, that lawyer had rejected her case. Doc. # 63 exh. 4 at 24.

Though Dr. Johanning has not prescribed medicine for Jazairi, the primary treatment for an allergic reaction to mold in her apartment would be avoidance of that environment. Doc. # 40 at 76. Hence, it was unnecessary for him to do so. The $3,000 payment to prepare for a deposition and to discuss his findings with plaintiff's attorney suggests expert witness status, but is not necessarily determinative. *See Brown*, 169 F.R.D. at 387-88 n.3. Thus, while the Court has gave doubts about Dr. Johanning's status as a treating physician, the evidence is not conclusive.

The defendants also suggest that, to the extent Jazairi relies on Dr. Johanning's testimony to support her general causation theory, he is exceeding his role as treating physician and must provide an expert report. Doc. # 72 at 15. However, each of Jazairi's physicians considered the potential causes of her symptoms (i.e., cigarette smoking, mold, allergies, etc.) when treating her.[17] *See* doc. # 40 at 122-24; doc. # 41 at 54, 124. Thus, if Dr. Johanning is considered a treating physician, then he remains within that role when explaining the causation of her symptoms.

To be sure, plaintiff has pushed the expert witness/treating physician distinction, and thus the expert-witness report rule, to an extreme here. But defendants have demonstrated neither prejudice[18] nor bad faith to justify Rule 37(c) exclusion of Dr. Johanning's testimony, which is otherwise crucial to her case. Because the law on this point is unclear *and* the Court is ultimately excluding Dr. Johanning's testimony on other grounds, *see infra* Part III(B), it denies defendants' motion to exclude his testimony on these grounds.

### B. Daubert Challenge

#### 1. Governing Standards

Jazairi alleges that Royal Oaks negligently exposed her to toxic mold and bacteria spores

---

[17] Contrast a physician who is treating a patient with a broken bone. There the physician need not determine the cause of the injury, but only the type of fracture and proper method of treatment. *See Henderson*, 2005 WL 1208311 at *5. In Jazairi's situation, however, diagnosis and treatment depend on determining the cause of her injuries.

[18] Defendants have fully deposed him and have had complete access to his medical records on Jazairi.

causing her injuries. To prove her personal injury claims, she must establish that she was exposed to mold and bacteria; that those substances are capable of causing the types of injuries she sustained (general causation); and that the mold and bacteria she encountered at the Royal Oaks apartment actually did cause her injuries (specific causation). *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1252 (11th Cir. 2005). This type of proof requires the use of expert witnesses.

Defendants challenge the opinion of plaintiff's proffered expert as lacking a reliable foundation for admission under the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). F.R.Evid. 702 lays the foundation for the Court's *Daubert* analysis. 509 U.S. at 590. It authorizes the admission of expert opinion testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." F.R.Evid. 702.

> *Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury. *Id.* at 589 n.7, 597, 113 S.Ct. 2786. As a gatekeeper the court must do "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593-94, 113 S.Ct. 2786. The proposed testimony must derive from the scientific method; good grounds and appropriate validation must support it. *Id.* at 590, 113 S.Ct. 2786. "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* The court must consider the testimony with the understanding that "[t]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion...." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004).

*McClain*, 401 F.3d at 1252 (footnote omitted).

The *Daubert* Court listed four noninclusive factors for courts to consider in determining reliability under Rule 702:(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community. 509 U.S. at 593-94. These four factors are not exhaustive, but merely the starting point of a *Daubert* analysis. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). Some other factors courts have considered are reliance on anecdotal evidence, temporal proximity, and improper extrapolation. *Id.*; *General Electric Company v. Joiner*, 522 U.S. 136 (1997).

Though the focus of the reliability inquiry "must be solely on principles and methodology, not on the conclusions they generate," *Daubert*, 509 U.S. at 595, "conclusions and methodology are not entirely distinct." *Joiner*, 522 U.S. at 146. "Thus, even when an expert is using reliable principles and methods, and is extrapolating from reliable existing data," the Court may exclude the expert's opinion if "there is simply too great an analytical gap between the data and the opinion proffered." *Frazier*, 387 F.3d at 1276.

In considering evidence to preliminarily

determine the reliability of an expert on a *Daubert* challenge, the Court is not restricted by the Federal Rules of Evidence. *See* F.R.Evid. 104(a) ("Preliminary questions concerning ... the admissibility of evidence shall be determined by the court.... In making its determination it is not bound by the rules of evidence except those with respect to privileges"); *Frazier*, 387 F.3d at 1275.

### 2. Dr. Johanning

This is not a toxic tort case.[19] *See* doc. # 41 at 126-28, 131 (Dr. Johanning claims that Jazairi's problems are caused by a rare allergic response to mold spores rather than a toxic reaction). Nevertheless, *McClain*, a recent Eleventh Circuit toxic tort case, informs the *Daubert* analysis here. There the court suggested that there are two types of toxic tort cases: those cases in which the medical community generally recognizes that exposure to the substance is capable of causing the type of injury alleged, and those cases in which the medical community does *not* generally recognize the agent as capable of causing that injury. 401 F.3d at 1252.

In the former category of cases, the Court need not undertake an extensive *Daubert* analysis on the *general* causation question because the medical community recognizes that the agent causes the type of harm the plaintiff is alleging. *Id.* Rather, the focus should be on *specific* causation: "was plaintiff exposed to the toxin, was plaintiff exposed to enough of the toxin to cause the alleged injury, and did the toxin in fact cause the injury?" *Id.* Conversely, "[i]n the second category of toxic tort cases, the *Daubert* analysis covers not only the expert's methodology for the plaintiff-specific questions about individual causation but also the general question of whether the drug or chemical can cause the harm plaintiff alleges." *Id.*

After narrowing plaintiff's alleged injuries exclusively to mold-induced hypersensitivity lung injury, diagnosed by Dr. Johanning, this case falls into the category where general causation is recognized by the scientific community.[20] Dr. Johanning asserts that there is "quite a bit" of scientific literature indicating that exposure to some molds and bacteria can cause pulmonary inflamation in susceptible persons, though it is a rare condition. Doc. # 41 at 127. Plaintiff demonstrates this by proffering numerous peer-reviewed, scientific articles[21]

---

[19] While plaintiff alleged numerous physical and mental ailments that she claims were cause by her exposure to "toxic mold," she has only presented evidence of a causal link to her alleged allergy-based lung problems, which Dr. Johanning suggests are "resolved or resolving." Doc. # 41 at 96, 112, 115, 119, 130-32, 142, 154. Her personal injury claims associated with other, non-related symptoms therefore must be dismissed.

[20] Conversely, the medical community does not generally accept the theory that "toxic mold" causes other illnesses, such as the slew of ailments plaintiff reports here. *See, e.g.*, Institute of Medicine of the National Academies, DAMP INDOOR SPACES AND HEATH at 2 (2004) (doc. # 50 exh. F); American College of Occupational and Environmental Medicine, Evidence-based statement, *Adverse Human Health Effects Associated with Molds in the Indoor Environment* at 1 (10/27/02), available at http://www.acoem.org/guidelines/article.asp?ID=52 (site as of 6/23/05) (hereinafter "ACOEM Report"), doc. # 50 exh. G; *Graham v. Lautrec, Ltd.*, 2003 WL 23512133 *6 (Mich.Cir.Ct. 2003) (unpublished) (concluding that "there is no well-substantiated evidence linking the presence of indoor mold and the health concerns elaborated in the scientific and lay press").

[21] A separate question arises as to the admissibility of the scientific literature proffered by plaintiff concerning general causation, since neither Dr. Johanning, nor any other expert, though affidavit, deposition, or expert report, has testified concerning the general causation theory. The Court does not reach this issue.

discussing the disease.[22] *See* doc. # 64 exhs. 23-26. In addition, Dr. Costanzo, a pulmonary specialist and treating physician here, agrees that it is common medical knowledge that inhalation of mold spores can cause hypersensitivity pneumonitis. Doc. # 40 at 63, 82-83.

Royal Oaks makes a weak attempt to refute this notion by citing to broad statements in scientific publications about the inadequate causal association between molds and general adverse health effects. *See* doc. # 47 at 9-11. However, the defendants have failed to produce a single scientific study indicating that molds are not capable of causing hypersensitivity pneumonitis or similar allergic inflammatory lung problems. *Id*.

As for specific causation, Dr. Johanning proposes to testify that by utilizing a differential diagnosis method, he has determined to a reasonable degree of medical certainty that Jazairi suffers from an inflammatory lung condition caused by exposure to the mold and bacteria in her Royal Oaks apartment. Doc. # 41 at 112. The differential diagnosis process requires a physician to list the known possible causes of a patient's symptoms, then, by utilizing diagnostic tests, eliminate causes from the list until the most likely cause remains.[23] The diagnostic tests may include physical examination, medical history, testing of blood and bodily fluids; X-rays, CT scans, MRIs, MRAs, and any of a host of generally accepted techniques for eliminating or "falsifying" a hypothesized disease. *Brasher v. Sandoz Pharmaceuticals Corp.*, 160 F.Supp.2d 1291, 1297 (N.D.Ala. 2001).

The process requires physicians to both "rule in" and "rule out" the possible causes of the symptoms through accepted scientific reasoning and diagnostic tests. Defendants argue that Dr. Johanning improperly ruled-in mold exposure because (1) scientists have not produced a definable standard for determining at what level of mold exposure a person will react, and (2) no measurement of airborne mold spores was taken to determine the level of mold spores inhaled by Jazairi. Doc. # 47 at 9. They also contend that Dr. Johanning employed a flawed differential diagnosis in that the objective diagnostic testing showed that Jazairi has no sensitivity or reaction

---

[22] *See, e.g.*, Paul A. Greenberger, M.D., *Mold-Induced Hypersensitivity Pneumonitis*, Allergy and Asthma Proc., Vol. 25, No. 4 at 219-223 (July-August 2004) ("Mold-induced hypersensitivity pneumonitis results from macrophage- and lymphocyte-driven inflammation, which may be attributed to contaminated humidifiers or heating-ventilation systems or sources in homes, schools or workplaces"); Rachel E. Story, M.D., MPH, et al., *Hypersensitivity Pneumonitis*, Allergy and Asthma Proc., Vol. 25, No. 4 at S40-S41 (July-August 2004) ("Residential contact with agents responsible for HP now accounts for most new cases of the disease with pet birds, contaminated humidifiers, and indoor molds being the most frequent sources of exposure"); *see also Dodd v. Gottula*, 1996 WL 353792 *1 (10th Cir. 1996) (unpublished) ("HP is a respiratory disorder caused by inhaling an airborne fungus, which triggers an immune reaction"); *Roche v. Lincoln Property Co.*, 278 F.Supp.2d 744, 757-59 & n.5 (E.D.Va. 2003) (citing numerous articles finding that molds can cause hypersensitivity pneumonitis and noting that the defendants acknowledged that some molds can generally cause allergic reactions).

[23] The Eleventh Circuit has recently clarified that the "etiology" of a disease is its external cause or origin. *McClain*, 401 F.3d at 1252. The more precise but rarely used term to describe "the investigation and reasoning that leads to the determination of external causation" is "differential etiology." *Id*. (citing Mary Sue Henifin, et al., *Reference Guide on Medical Testimony*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 439, 481 (Federal Judicial Center, 2d ed. 2000)). Here the two differential techniques converge in a sense as the doctors diagnosing Jazairi's lung symptoms considered the external exposure sources (e.g., mold, cigarettes, allergens, etc.) when determining potential diseases she might have. *See* doc. # 40 at 122-24; doc. # 41 at 54, 124.

to the specific molds present in her apartment. *Id.*

The Court concludes that Dr. Johanning's testimony fails to meet the *Daubert* standards. He is unable to establish through scientifically acceptable methodology that Jazairi was injured by the molds contained within her Royal Oaks apartment because he fails to properly rule in the specific molds contained in her apartment and rule out several potential causes.

As an initial matter, it is not dispositive that the scientific community has not established threshold exposure limits or a dose-response relationship between mold spores and the injuries that plaintiff allegedly suffered. Nor is it a fatal defect that plaintiff failed to perform airborne spore tests to determine what quantity of mold existed. While such evidence would be optimal, the lack of such evidence could be overcome if plaintiff can (1) demonstrate by circumstantial evidence that she likely was exposed to mold in quantities capable of causing her injuries and (2) establish through a valid scientific process that her injury was caused by exposure to that type of mold.

In *McClain,* the plaintiffs allegedly sustained injuries from a toxic response to the diet drug ephedrine. 401 F.3d at 1236. There the court described key principles of toxicology that a court should consider in reviewing an expert's determination of whether exposure to a chemical was casually related to a specific adverse effect. *Id.* at 1242. "Foremost among these principles is the dose-response relationship." *Id.* Often low doses of exposure to a harmful agent, the court explained, will have no consequences at all. *Id.* Hence, plaintiffs should demonstrate exposure to a sufficient amount to cause the health effects in question. *Id.* "The expert who avoids or neglects this principle of toxic torts *without justification* casts suspicion on the reliability of his methodology." *Id.* (emphasis added).

That court also discussed other considerations in proving toxic tort causation, including (1) whether the toxic substance has been demonstrated to cause the specific illness alleged; (2) whether the chronological relationship between exposure and effects is biologically plausible; and (3) the likelihood that exposure to the agent caused the illness in the context of other known diseases. *Id.* at 1242-43.

In *Roche*, a mold case similar to this one, the court excluded expert testimony that concluded the plaintiffs were suffering from a toxic and allergic response to mold. 278 F.Supp.2d at 746, 765. Though not proposed by either party, there the court applied toxicology methods to address the reasoning of an expert allergist. *Id.* at 754. It noted that articles relied on by the expert revealed no known quantitative standards or guidelines for the acceptable level of mold. *Id.* It thus found the expert's conclusions, that mold was the cause of plaintiff's injuries, suspect and lacking scientific support. *Id.* at 755.

In *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999), the plaintiff alleged that he suffered from a sinus condition caused by inhalation of airborne talc. There the defendants challenged plaintiff's expert testimony because he could not assess what level of exposure was adequate to produce sinus irritation. *Id.* at 263. The court recognized that

> rarely are humans exposed to chemicals in a manner that permits a quantitative determination of adverse outcomes.... Human exposure occurs most frequently in occupational settings where workers are

exposed to industrial chemicals like lead or asbestos; however, even under these circumstances, it is usually difficult, if not impossible, to quantify the amount of exposure.

*Id.* (quoting Federal Judicial Center, *Reference Manual on Scientific Evidence* 187 (1994)).

Consequently, while precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation.

*Id.* (noting that "it was undisputed that inhalation of high levels of talc irritates mucous membranes"). Therefore, the court held that lay testimony about plaintiff's working conditions could permit a factfinder to conclude that plaintiff was exposed to sufficiently high concentrations of airborne talc to cause him injury. *Id.* at 264.

Here plaintiff did not perform sampling in her apartment to determine the level of air borne mold spores to which she was exposed. Doc. # 41 at 114. However, as suggested in *Westerberry*, it would be unusual for a person to order air sampling of her apartment when her leasor admitted to the presence of mold and agreed to remediate it.

Dr. Johanning also testifies that there are no definitive threshold limit values (TLVs) to determine what type and level of mold spores must be present to cause an inflammatory lung condition such as Jazairi's. *Id.* at 50-51. He suggests that the level of reactivity changes depending on the types of molds and bacteria present, and on the genetic makeup of the individual exposed. Doc. # 64 attachment. Since the hypersensitivity reaction is an allergic reaction, rather than a toxic reaction, the dose-response relationship will depend on the biological variations of the exposed individuals.[24] *Id.* Hence, the scientific community cannot (or has not) developed a specific dose-response standard. *Id.* at 2.

The Court agrees with defendants that the lack of scientifically-accepted mold TLVs should diminish the Court's confidence in Dr. Johanning's expert opinions. But the absence of such a standard and corresponding measurements is not determinative. While *McClain* suggested that an expert who avoids or neglects the dose-response relationship "without justification" is suspect, 401 F.3d at 1236, here Dr. Johanning has produced sufficient justification for the lack of a verifiable TLV standard.

Nevertheless some other objective evidence must be produced to demonstrate causation. For example, if plaintiff demonstrates that the same molds found in Jazairi's apartment were found growing in her lungs; or if test results indicate that her body reacts acutely to those specific molds; or if she suffered from symptoms that could only be caused by exposure to the molds found in her apartment; then she might still be able to establish causation through an accepted

---

[24] About 10% of the population has allergic antibodies to fungal antigens, but only half of those (5%) show clinical illness. ACOEM Report at 1. Allergic responses are most commonly in the form of allergic asthma or allergic rhinitis ("hay fever"); however, HP, a rare, immune-related condition, may follow exposure to very high concentrations of molds and other microbial proteins. *Id.*

scientific methodology despite the absence of specific exposure data. Here Dr. Johanning has not produced the type of evidence needed to overcome the lack of exposure data because he can not adequately rule in the specific molds contained in Jazairi's apartment in order to support his differential diagnosis.

In that respect, testing of the biological growth in her apartment revealed the presence of Stachybotrys chartarum, Aspergillus, Aureobasidium, Cladosprium, and Alternaria. Doc. # 50 exh. FF. But Dr. Johanning has not identified what species, or what percentage of the species, associated with those mold genera are capable of causing lung inflammation in sensitive individuals. Thus, it has not been established that those molds in Jazairi's apartment are even capable of injuring her.

Moreover, when Dr. Johanning tested Jazairi for exposure/allergic response to those types of molds, he received *negative* results. Doc. # 41 at 109, 88. Hence, even if the Court assumed that the molds found in Jazairi's apartment are capable of causing her reaction, he can produce no verifiable evidence linking Jazairi's alleged allergic response to those molds. He has therefore not ruled in those molds as potential causes of her lung condition.

Dr. Johanning did find an allergic response to Thermoactinomyces, a genus of bacteria that was *not* found in Jazairi's Royal Oaks apartment but *is associated* with HP.[25] He attempts to correlate this bacteria with mold, suggesting that it is mold-like. Doc. # 41 at 109, 116. However, he fails to suggest how often this genus of bacteria grows with mold, such as that contained in Jazairi's apartment, so as to explain the likelihood that it was contained in the Royal Oaks apartment. He has not even suggested whether it looks like the molds seen in her apartment. *See* doc. # 41 at 116. Moreover, he has not explained where else Jazairi might have contacted that bacteria. Hence, there is *no* scientific evidence suggesting that Royal Oaks is responsible for Jazairi's exposure to that substance. Thus, there is no established connection between (1) the mold in Jazairi's Royal Oaks apartment and (2) Thermoactinomyces or Jazairi's alleged inflammatory lung condition.

Dr. Johanning also relied on temporality to correlate Jazairi's symptoms to the mold in her Royal Oaks apartment. Doc. # 41 at 50. He points out that her symptoms began when she moved into the apartment and her X-rays and PFTs improved after she moved out of the apartment. *Id.* at 141, 150, 154. Yet, Jazairi had no pre-exposure X-rays or PFTs for Dr. Johanning to compare.[26] *Id.* at 101. Moreover, her lung symptoms (chest pain, shortness of breath, coughing, wheezing) did not start until after she moved out of the Royal Oaks apartment, and those symptoms are apparently unrelated to the X-ray and PFT findings since the symptoms have continued while the test results have improved. *Compare* doc. # 40 exh. 72 & doc. # 63 exh. 1 (Jazairi did not complain of chest symptoms until after moving out of the apartment) *and* doc. # 40 exh. 75 (she reported worsening pulmonary symptoms four months after moving out) *and* doc. # 44 at 39-40, 56 (she

---

[25] An elevation of antibodies to specific molds or bacteria is *not* indicative of a clinical illness because similar elevations are found in well patients. Doc. # 41 at 89, 64. Antibodies thus reflect exposure, not disease. *Id.*; doc. # 40 at 65.

[26] Obviously, Jazairi would not be expected to have diagnostic testing performed prior to incurring an injury. Nevertheless, the lack of historical medical data undermines the temporal connection.

13

now asserts that her symptoms have remained the same and some, including chest pain, have gotten worse; none have gotten better) *with* doc. # 41 at 96, 115, 119 (Dr. Johanning asserts that her lung condition is resolved or resolving).

The temporality evidence presented by Dr. Johanning is thus inconclusive at best. The chronology of Jazairi's X-ray/PFT abnormalities is speculative since it is unclear when they began. And her self-reported pulmonary symptoms do not correlate with her residence at the Royal Oaks or with the testing results. Consequently, Dr. Johanning has provided inadequate scientific support for his theory that the mold contained in the Royal Oaks apartment caused Jazairi's alleged lung injury.

Dr. Johanning also improperly ruled out potential causes of Jazairi's symptoms. Upon initially examining her, he listed unspecific allergies as a potential cause. Doc. # 41 at 73; doc. # 40 at 38. However, he failed to test for allergies to dogs, pollen, grass, and other allergens commonly found in Jazairi's area of residence. He reasoned that since she did not identify a history of seasonal allergies that he had no reason to test for them. Doc. # 41 at 80-81, 107. However, he also suggested that he only did testing for "things that people typically have when they have moisture related problems." *Id.* at 107-08. He thus failed to explore the possibility that Jazairi's symptoms were caused by a non-moisture related cause; this prevented him from ruling out possibilities such as unspecific allergies.

Moreover, Dr. Costanzo noted air trapping in Jazairi's lungs, which would be inconsistent with restrictive lung disease. Doc. # 40 at 76, exh. 76. This would be more consistent with untreated bronchitis caused by mucus blockage. *Id.* at 90. She also found dilated mucous glands and an increased prominence of mucosal corrugations. Doc. # 50 exh. M. These findings are suggestive of chronic bronchitis caused by cigarette smoking. Doc. # 40 at 22.

Dr. Johanning has completely failed to discuss those findings in relation to his diagnosis, which ruled out cigarettes as a potential cause. *See* doc. # 41 at 120-25. Instead, he suggests that Jazairi, despite having smoked a pack of cigarettes per day for twenty years, is too young to have any smoking related lung problems.[27] *Id.* While Dr. Johanning also attempted to rule out smoking effects based on the fact that Jazairi's condition has resolved (he fails to explain why Jazairi's physical symptoms continue) and that the X-ray findings are more consistent with an allergic lung problem than asthmatic bronchitis,[28] *id.* at 120-25, 141, 155, his diagnosis is not complete without a discussion of the specific factors used by Dr. Costanzo, Jazairi's pulmonary specialist, to diagnose her with smoking-induced asthmatic bronchitis.

This leads to a separate point that although Dr. Johanning disagrees with Dr. Costanzo's conclusions, he effectively adopts her differential diagnosis in order to eliminate almost every other potential cause of her symptoms. *See* doc. # 41 at 119, 156. First, this seems to be an awkward position: to rely on a physician's differential diagnosis in one breath and then disagree with that physician's

---

[27] Dr. Johanning provided no scientific data to support this statement. It is contradicted by Dr. Costanzo's testimony that the timing of cigarette-induced problems is variable and depends on the volume of cigarettes and other factors. Doc. # 40 at 13.

[28] Dr. Costanzo suggests that HP usually produces bronchiolitis that may not show up at all on an X-ray. Doc. # 40 at 76.

14

conclusions in the next.

Second, Dr. Costanzo never testified that, through a differential diagnostic process, she had eliminated every potential cause except for asthmatic bronchitis and mold-induced HP. Instead she found smoking-induced asthmatic bronchitis to be the most likely cause because Jazairi's symptoms match what she sees 80% of the time. Doc. # 40 at 43.

It is true that Dr. Costanzo never medically ruled out the possible diagnosis of mold-induced HP. Doc. # 40 at 26. However, there is no indication that Dr. Costanzo medically ruled out every other potential diagnosis except HP, or that she would have diagnosed Jazairi with HP,[29] a rare disease, if she had medically ruled out asthmatic bronchitis. In fact, while she recognized that "it's possible" that Jazairi had some effects associated with mold shortly after he exposure, as of 7/2004, she did not believe that Jazairi's current symptoms (her physical symptoms did not improve) could be attributed to mold exposure. *Id.* at 41.

Dr. Johanning thus assumes that Dr. Costanzo, and other doctors, medically ruled out every other potential cause except HP and asthmatic bronchitis. Doc. # 41 at 119. But there is no explanation in the record of how every other potential diagnosis was ruled out. And Dr. Johanning did not otherwise perform the differential diagnosis himself. *Id.*

Furthermore, Dr. Costanzo explains that Dr. Johanning, an occupational/environmental physician, may not be equipped to employ a differential method to diagnose lung diseases.

Doc. # 40 at 85. She suggests that Jazairi's X-ray symptoms could be attributed to viral pneumonia, an infection, or obesity. *Id.* at 86, 88. Dr. Johanning failed to adequately rule out these and other possibilities.[30]

In performing a differential diagnosis, physicians typically list potential causes accordingly to likelihood that they are present. *Brasher*, 160 F.Supp.2d at 1297. They then begin with the most likely cause and attempt to rule it in or out based on objective diagnostic tests. *Id.* While approximately 5% of individuals exposed to high concentration of mold will show some allergy-based clinical illness, the most common illnesses are allergic asthma or allergic rhinitis ("hay fever"). ACOEM Report at 1. HP presents only in susceptible people who make up a small component of that 5%. *Id.*; doc. # 41 at 127-28; doc. # 63 exh. 28 at 3. In addition, smokers, like Jazairi, are less likely to get HP than non-smokers. Doc. # 40 at 84; doc. # 41 at 121.

Hence, in a differential diagnosis, HP should only be considered as one of the least-likely potential causes of Jazairi's symptoms. Therefore, most other potential causes, even if unlikely, should be properly ruled out before a diagnosis of HP can be reached. Here Dr. Johanning has failed to do that in any scientifically acceptable manner. His reliance on other doctors' opinions, which have not been explained here, simply will not suffice. These distinct flaws in Dr. Johanning's differential

---

[29] According to Dr. Costanzo, HP is considered a very difficult disease to diagnose. Doc. # 40 at 64; *see also* doc. # 63 exh. 24.

[30] He does suggest that "I just saw a film on obesity in America. I don't think she clearly matches, you know, the general level of what people consider obese in this country so I don't think it would explain it." Doc. # 40 at 125. However, what "people consider obese in this country" is not a proper scientific foundation for eliminating obesity as a potential cause of unusual X-ray findings or breathing defects.

method lead this Court to conclude that his testimony cannot satisfy the *Daubert* standard.

After determining that Dr. Johanning's testimony is inadmissible, it is clear that Jazairi can not produce sufficient evidence to demonstrate that the mold contained in her Royal Oaks apartment caused any of the symptoms alleged in her Complaint. Hence, summary judgment is appropriate on her personal injury claims and claims deriving therefrom (lost income and earning capacity).

### C. Remaining Issues

After Jazairi moved out of her Royal Oaks apartment in October 2002, she lived for a month or two in a tent on undeveloped land before moving into another apartment. Doc. # 63 exh. 4 at 42. She continued to store some of her property on that land for the next year. *See id*. exh. 4 at 106-09. Concerned that her belongings had been "cross-contaminated" by the Royal Oaks mold, in July 2003 she had a "representative sample" of her personal items (both at the undeveloped property and in her new apartment) tested for mold contamination.[31] Doc. # 63 exh. 37 ¶ 2, exh. 4 at 106-09. Those items tested positive for Stachybotrys chartum, and the mold genera Cladosporium and Penecillium, some of the same molds previously found in her apartment. Doc. # 50 exh. FF, S. Consequently, she buried *all* of her belongings (allegedly worth $89,000), doc. # 50 exh. DD at 10, and now seeks recovery for that personal property. Doc. # 67 at 21.

Her expert on that score, certified industrial hygienist Kenneth Warren, suggests that "porous materials, such as pillows, fabric furniture, curtains, etc., from which mold growth cannot be adequately cleaned ... may have to be discarded, as mold will infiltrate porous materials and complete removal may be impossible." Doc. # 63 exh. 31 ¶ 6 (citing Mold Remediation in Schools and Commercial Buildings, EPA 402-K-01-001 at 17 (2001)).

Defendants do not *Daubert*-challenge Warren, but instead move for summary judgment on this claim. They argue that the vast majority of Jazairi's property was never tested for mold, and that her unilateral decision to destroy it is not a foreseeable result of any negligent act of the defendants. Doc. # 37 at 20, 21. They cite to the general rule that

> if, subsequently to an original wrongful or negligent act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune, the former must be considered as too remote, still if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.

*Gulf Oil Corp. v. Stanfield*, 213 Ga. 436, 439 (1957) (quoting *Southern Ry. Co. v. Webb*, 116 Ga. 152 (1902)).

The Court rejects this argument. Jazairi can testify, and a jury could find, that her belongings were drained of value *before* she discarded what by then constituted sheer garbage. And

---

[31] Plaintiff tested a beach bag, a basket, papers, a pillow case, bedspread, bath boot, envelope, and vents from her automobile. Doc. # 50 exh. FF.

defendants have raised no spoliation issue here.

However, since Jazairi's expert says that only *porous* items that could not effectively be cleaned might have to be discarded, doc. # 63 exh. 31 ¶ 6, she is entitled to recover only for the fair market value of those items shown to be porous and irreparably mold-damaged:

> The measure of damages for ... damage to personal property is the difference between the fair market value of the property immediately before and immediately after the damage. Factors that can be considered in determining this amount include the condition of the property prior to the damage, retail value at the time of the damage and the salvage value after the loss. Where the original purchase price of the destroyed property can only be estimated, slight, any or some evidence of fair market value if sufficient to present a jury question. Although damages must be proven with reasonable certainty, it is not necessary to prove exact figures.

AGNOR'S GEORGIA EVIDENCE FOUNDATION CHECKLIST (2005) (citing *Hodges v. Vara*, 268 Ga.App. 815, 818 (2004)).

A jury therefore must resolve both causation (whether Royal Oaks' alleged negligence proximately caused the mold to form on and thus damage her belongings) and damages (including valuation), as proof on both are indispensable here. *See Blackford v. Wal-Mart Stores, Inc.*, 912 F.Supp. 537, 539 (S.D.Ga.1996) (when damage cannot be shown, liability is irrelevant).

## IV. CONCLUSION

Accordingly, the Court ***GRANTS*** defendants' motion (doc. # 46) to Exclude Specific Causation Testimony from Dr. Eckardt Johanning. Consequently, the Court also ***GRANTS*** defendants' motion (doc. # 36) for summary judgment against plaintiff Chris Jazairi on her personal injury-based claims. The Court also ***GRANTS*** plaintiff's motion to supplement her response, doc. # 64, but ***DENIES*** as moot all other pending motions in this case. Doc. ## 48, 73, 77, 88. Finally, the case shall proceed to a jury trial on plaintiff's personal property loss claim, so the parties are directed to file a Consolidated Pretrial Order within 20 days of the date this Order is served. Any further motions involving the flow of, or exclusion of, evidence at trial shall also be filed within 20 days of the date this Order is served.

This 23 day of June, 2005.

_____
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA